# United States Court of Appeals

*for the*

# First Circuit

Case No. 24-1628

CANNA PROVISIONS, INC.; GYASI SELLERS; WISEACRE FARM, INC.;
VERANO HOLDINGS CORP.,

*Plaintiffs-Appellants,*

v.

MERRICK B. GARLAND, Attorney General,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF MASSACHUSETTS, SPRINGFIELD IN CASE NO. 3:23-CV-30113-MGM
HONORABLE MARK G. MASTROIANNI, DISTRICT JUDGE

## BRIEF FOR PLAINTIFFS-APPELLANTS

DAVID BOIES
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, New York 10504
(914) 749-8200

JONATHAN D. SCHILLER
MATTHEW L. SCHWARTZ
DAVID P.G. BARILLARI
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
(212) 446-2300

JOSHUA I. SCHILLER
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, California 94104
(415) 293-6800

*Attorneys for Plaintiffs-Appellants*

 COUNSEL PRESS    (800) 4-APPEAL • (332334)

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Plaintiffs-Appellants certify the following pursuant to Federal Rule of Appellate Procedure 26.1(a).

Plaintiff-Appellant Canna Provisions, Inc. is 100% owned by Better Provisions, LLC, a Delaware Limited Liability Company. Better Provisions LLC has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellant Wiseacre Farm, Inc. has no parent corporation, and no publicly held corporation owns 10% more of its stock.

Plaintiff-Appellant Verano Holdings Corp. is a publicly held corporation with no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## <u>TABLE OF CONTENTS</u>

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES PRESENTED....................................................1

STATEMENT OF THE CASE............................................................................3

      A.  The Federal Government Adopts a Comprehensive Scheme to Eliminate Marijuana, Then Abandons That Scheme. ..........................3

      B.  Procedural History................................................................................7

STANDARD OF REVIEW ................................................................................8

SUMMARY OF ARGUMENT ...........................................................................8

ARGUMENT .................................................................................................15

I.    The CSA's Prohibition on State-Regulated Marijuana Is Not Necessary and Proper to Achieving any Current Congressional Interstate Goal................................................................................15

      A.  The Federal Government Lacks a General Police Power and Can Regulate Intrastate Commerce Only When Doing So Is Necessary and Proper to Carrying Out One of the Government's Enumerated Powers.....................................................16

          1.  To Satisfy the Necessary and Proper Clause, Congress's Regulation of Local Commerce Must Be Plainly Adapted to Achieving an Interstate Commerce Goal and Consistent with Federalism.................................................18

          2.  The Necessary and Proper Clause Permits Congress to Regulate Local Commerce Only Where the Local Activities Interfere with Interstate Commerce or Congress's Regulation Thereof.................................................21

              a.  Congress Can Regulate Local Commerce That Substantially Burdens or Obstructs Interstate Commerce. ...........................................22

              b.  Congress Can Regulate Local Commerce That Substantially Interferes with or Obstructs Congress's Regulation of Interstate Commerce. ...........................................23

B.  In *Raich*, the CSA's Prohibition on State-Regulated Marijuana Satisfied the Necessary and Proper Clause, Because Congress Then Intended to Eradicate Marijuana and Had Determined That Banning State-Regulated Marijuana Was Essential to That Goal. ...................................................................................26

　1.  When *Raich* Was Decided, Congress's Goal Was to Create a Comprehensive Scheme Prohibiting All Interstate Transactions in Marijuana.........................................26

　2.  When *Raich* Was Decided, Congress Believed that Prohibiting Interstate Marijuana Was Essential to Congress's Interstate Goal of Eliminating Marijuana. .............28

　3.  When *Raich* Was Decided, Congress's Findings about State-Regulated Marijuana Were Supported by the Then-Undisputed Facts.......................................................29

C.  The Legislative and Operative Facts That Were Material in *Raich* Have Changed Dramatically, and the CSA's Prohibition on State-Regulated Marijuana Can No Longer Be Upheld Under the Necessary and Proper Clause. ............................................30

　1.  Congress Has Abandoned Both Its Goal of Controlling Marijuana and Its Finding That Prohibiting State-Regulated Marijuana Is Essential to the CSA..........................30

　2.  The Two Decades Since *Raich* Have Proven That State-Regulated Marijuana Does Not Substantially Interfere with Federal Regulation of Interstate Marijuana. .....................34

　3.  Today's Federal Marijuana Regime Fails Under the *Raich* Test. ............................................................36

D.  The District Court Erred by Misstating the *Raich* Standard and Holding That This Standard Permits No Fact-Finding. .....................40

　1.  The District Court Incorrectly Read Raich as Permitting Regulation of Any Local Activity That Substantially Affects Interstate Commerce, Regardless of Whether It Obstructs or Interferes with an Interstate Goal........................40

　2.  The District Court Incorrectly Concluded That *Raich* Permits No Fact Development in Any Challenge to Congress's Regulation of Intrastate Commerce. .....................43

II.  Plaintiffs-Appellants Plausibly Alleged a Fifth Amendment Claim
     Based on the Long History of Laws and Practices Recognizing
     Marijuana's Importance..................................................................46

     A.  Marijuana Cultivation and Usage Is Deeply Rooted in the
         Nation's History and Tradition. ..........................................47

         1.  The Original Colonies Promoted Marijuana Cultivation. ........48

         2.  Marijuana Was Widely Used for Medical and
             Recreational Use Around the Passage of the Fourteenth
             Amendment. ................................................................51

         3.  At English Common Law, Marijuana Was Categorized as
             a Productive Crop, and Its Cultivation Was Protected by
             Laws Dating Back to the Magna Carta. ...................................52

     B.  The Widespread Adoption of State-Regulated Marijuana
         Programs Further Demonstrates the Importance of Marijuana
         Commerce. .........................................................................55

CONCLUSION ........................................................................................57

# TABLE OF AUTHORITIES

**Cases**

*Abdallah v. Bain Cap. LLC*,
   752 F.3d 114 (1st Cir. 2014) .................................................................8

*Artis v. D.C.*,
   583 U.S. 71 (2018) ..................................................................... passim

*Bais Yaakov of Spring Valley v. ACT, Inc.*,
   798 F.3d 46 (1st Cir. 2015) ...............................................................16

*Bond v. United States*,
   572 U.S. 844 (2014) ................................................................... 16, 18

*Cook v. Gates*,
   528 F.3d 42 (1st Cir. 2008) ...............................................................56

*Dobbs v. Jackson Women's Health Org.*,
   597 U.S. 215 (2022) ..................................................................... passim

*Gibbons v. Ogden*,
   22 U.S. 1 (1824) ........................................................................ 9, 17

*Gonzales v. Raich*,
   545 U.S. 1 (2005) ........................................................................ passim

*Heart of Atlanta Motel, Inc. v. United States*,
   379 U.S. 241 (1964) ...........................................................................23

*Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*,
   2024 WL 3357841 (N.D. Tex. July 10, 2024) ........................................ 26, 37, 39

*Hodel v. Indiana*,
   452 U.S. 314 (1981) ................................................................... 23, 25

*Irizarry v. United States*,
   427 F.3d 76 (1st Cir. 2005) ...............................................................8

*Jinks v. Richland Cnty., S.C.*,
   538 U.S. 456 (2003) .............................................................. 10, 19, 20

*Kahler v. Kansas*,
    589 U.S. 271 (2020) ....................................................................52

*Katzenbach v. McClung*,
    379 U.S. 294 (1964) ............................................................ passim

*Kerry v. Din*,
    576 U.S. 86 (2015) ............................................................... 47, 52

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ............................................................ 52, 55

*Leary v. United States*,
    395 U.S. 6 (1969) ......................................................................44

*McCulloch v. Maryland*,
    17 U.S. 316 (1819) .............................................................. passim

*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010) ............................................................ 14, 51

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981) ..................................................................45

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) .................................................. 11, 18, 20, 21

*Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*,
    45 F.4th 542 (1st Cir. 2022) .................................................. passim

*NLRB v. Jones & Laughlin Steel Corp.*,
    301 U.S. 1 (1937) ................................................................ 22, 23

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ............................................................ 53, 56

*Perez v. United States*,
    402 U.S. 146 (1971) ..................................................................23

*Reno v. Flores*,
    507 U.S. 292 (1993) ..................................................................47

*Richards v. Holder*,
    2014 WL 2805280 (D. Mass. June 19, 2014) ....................................................47

*Sacramento Nonprofit Collective v. Holder*,
    552 F. App'x 680 (9th Cir. 2014) ........................................................56

*Shelby Cty., Ala. v. Holder*,
    570 U.S. 529 (2013) ........................................................37

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*,
    531 U.S. 159 (2001) ........................................................17

*Standing Akimbo, LLC v. United States*,
    141 S. Ct. 2236 (2021) ................................................ 36, 37

*Timbs v. Indiana*,
    586 U.S. 146 (2019) ........................................................48

*United States v. Carolene Prod. Co.*,
    304 U.S. 144 (1938) ........................................................44

*United States v. Comstock*,
    560 U.S. 126 (2010) ................................................ 11, 18, 41

*United States v. Darby*,
    312 U.S. 100 (1941) ................................................ 22, 23

*United States v. Guess*,
    216 F. Supp. 3d 689 (E.D. Va. 2016) ................................................36

*United States v. Lopez*,
    514 U.S. 549 (1995)........................................................ passim

*United States v. Morrison*,
    529 U.S. 598 (2000)................................................ 19, 20, 45

*United States v. Volungus*,
    595 F.3d 1 (1st Cir. 2010) ................................................ 21, 39

*United States v. Wrightwood Dairy Co.*,
    315 U.S. 110 (1942) ................................................ 22, 25, 43

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ...................................................................... 14, 47, 48, 53

*Whole Woman's Health v. Hellerstedt,*
    579 U.S. 582 (2016) ...................................................................... 16, 44

*Wickard v. Filburn,*
    317 U.S. 111 (1942) ...................................................................... 22, 24, 41

**Constitutional Provisions**

U.S. Const. art. I, § 8 .............................................................................. 5, 10, 12, 17

**Statutes**

21 U.S.C. § 801 .......................................................................................... passim

21 U.S.C. § 802 ..........................................................................................4

21 U.S.C. § 812 ..........................................................................................4

21 U.S.C. § 841 ..........................................................................................4

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

28 U.S.C. § 1367 ........................................................................................19

**Rules**

Fed. R. Civ. P. 12 .....................................................................................1, 8

**Other Authorities**

*Acts and Laws of His Majesty's Province of New Hampshire in New England with*
    *Sundry Acts of Parliament* (1761) ..........................................................49

*Acts and Laws, of His Majesties Colony of Connecticut in New England: Passed by*
    *the General Assembly May 1716 to May 1749* (1919) .............................50

*Acts of the General Assembly of the Province of New-Jersey* (1776) ...................50

*Acts of the North Carolina General Assembly* (1764)..............................................50

*Acts Passed by the General Assembly of South-Carolina* (1736) ..........................50

*Black's Law Dictionary* (12th ed. 2024)....................................................54

Claire Priest, *Currency Policies and Legal Development in Colonial New England*, 110 Yale L.J. 1303 (2001) ...................................................................49

Edward Coke, *The Second Part of the Institutes of the Laws of England* (1797) ................................................................. 15, 53, 54

Giles Jacob, *Dictionary of English Law* (8th ed. 1762)..........................................54

*Laws of Maryland Made Since M,DCC,LXIII, Consisting of Acts of Assembly under the Proprietary Government* (1787)..........................................................50

Nadra O. Hashim, *Hemp and the Global Economy* (2017) ............................. 48, 55

*Records of the Colony of Rhode Island and Providence Plantations, in New England* (1859) ...................................................................49

*The Acts of Assembly of the Province of Pennsylvania* (1775) .............................49

*The Book of the General Lawes and Libertyes Concerning the Inhabitants of the Massachusetts* (1660)....................................................................49

*The Colonial Laws of New York from the Year 1664 to the Revolution* (1894)......50

*The Colonial Records of the State of Georgia* (1911) ............................................51

*The Records of the Virginia Company of London* (1906)........................................49

William Blackstone, *Commentaries on the Laws of England in Four Books, vol. 1* (1753) ................................................................. 54, 55

## **<u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>**

Plaintiffs-Appellants respectfully request oral argument.  This appeal presents multiple constitutional questions, including the proper standard for assessing Congress's authority to regulate local commerce under the Commerce Clause and Necessary and Proper Clause.  The issues at stake in this appeal include matters of importance both in the Commonwealth of Massachusetts and nationwide.  Plaintiffs-Appellants believe that oral argument will assist the Court's review of these issues.

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants challenge the constitutionality of the federal Controlled Substances Act, 21 U.S.C. § 801 *et seq*., as applied to them.  The district court had jurisdiction under 28 U.S.C. § 1331.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.  The district court dismissed Plaintiffs-Appellants' Complaint under Federal Rule of Civil Procedure 12(b)(6) on July 2, 2024, ADD16, and Plaintiffs-Appellants timely appealed on July 3, 2024, A142.[1]

## STATEMENT OF THE ISSUES PRESENTED

Since before the Founding, Americans have cultivated, traded in, and made use of marijuana.  In 1970, however, Congress passed the Controlled Substances Act ("CSA") banning marijuana outright.  In *Gonzales v. Raich*, 545 U.S. 1 (2005), the Supreme Court held that the CSA's prohibition on marijuana, even when it was purely local and permitted under state law, was within Congress's Commerce Clause and Necessary and Proper Clause authority because the prohibition was necessary and proper to effectuate the goal of eradicating all marijuana in *interstate* commerce.

But as this Court has recognized, "the CSA was not Congress's last word on the market in marijuana."  *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542, 549 (1st Cir. 2022).  In the nearly twenty years

---

[1] Citations to "ADD__" refer to the Addendum to this Brief.  Citations to "A__" refer to the Joint Appendix filed concurrently with this Brief.

1

since *Raich*, Congress has enacted legislation demonstrating that it no longer seeks to control comprehensively, let alone ban, all marijuana commerce. Thirty-eight states have now legalized and regulate marijuana within their borders.

Plaintiffs-Appellants operate marijuana businesses in full conformity with Massachusetts law and challenged the CSA as applied to the intrastate cultivation, manufacture, possession, and distribution of marijuana pursuant to state law. The district court acknowledged that Plaintiffs-Appellants "alleged persuasive reasons for a reexamination of the way the Controlled Substances Act ('CSA') regulates marijuana," but believed itself to be bound by *Raich*. ADD2. The questions presented on this appeal are:

1.  Whether Plaintiffs-Appellants plausibly allege that the CSA, as applied to local marijuana commerce in conformity with state law, exceeds Congress's Commerce Clause and Necessary and Proper Clause authority because an outright ban on state-regulated marijuana is not necessary and proper to achieve Congress's current legislative goals.

2.  Whether, in light of Plaintiffs-Appellants' allegations that the value of cultivating, possessing, and trading in marijuana has been recognized through centuries of Anglo-American legal tradition, they have plausibly alleged that the right to engage in those activities is deeply rooted in in the nation's history and therefore protected under the Fifth Amendment.

## STATEMENT OF THE CASE

### A. The Federal Government Adopts a Comprehensive Scheme to Eliminate Marijuana, Then Abandons That Scheme.

Marijuana is a flowering plant that has been cultivated, distributed, sold, and used in the United States since at least 1619. A30–A33 (Compl. ¶¶ 46–52). Each of the Thirteen Colonies enacted legislation to protect or promote commerce in marijuana (then known as hemp). A30 (Compl. ¶ 46). By 1868, when the Fourteenth Amendment was passed, marijuana was widely used for both medical and recreational purposes. A16 (Compl. ¶ 7). Its recognized medical benefits earned it a place in the United States Pharmacopoeia. A31 (Compl. ¶ 47). Its recreational uses were both advertised and commented on in mass media. *Id.* In 1876, Louisa May Alcott (the author of *Little Women*) published a short story about trying marijuana candies, concluding, "Heaven bless hashish, if its dreams end like this!" A31 (Compl. ¶ 48).

Subsequently, views on marijuana became mixed with racist sentiments against immigrants and minorities, and multiple states enacted strict controls or outright bans on the plant. A32–33 (Compl. ¶ 51). Throughout most of the 20th Century, however, intrastate marijuana remained exclusively within the province of the states. The federal government imposed labelling requirements on marijuana medicine that travelled in interstate commerce and imposed taxes on marijuana, but did not seek to regulate intrastate marijuana commerce. A33 (Compl. ¶ 52).

3

This changed in 1970, when Congress passed the CSA, which banned marijuana from all commerce, interstate and intrastate. A33 (Compl. ¶ 53). The CSA labeled marijuana a Schedule I controlled substance, making it a federal crime to "manufacture, distribute, or possess with intent to manufacture, distribute, or dispense" marijuana for any purpose, except as part of a federally approved research program. *Id.*; *see* 21 U.S.C. §§ 841 (a)(1), 802(16), 812(c).

In 1996, California lifted marijuana restrictions for certain seriously ill patients and their caregivers. *Gonzales v. Raich*, 545 U.S. 1, 5 (2005). The federal government responded by enforcing the CSA against participants in California's medical marijuana program, including raiding the home of a seriously ill California resident, Diane Monson, and destroying the marijuana that her doctor had directed her to use. *Id.* at 6–7. Monson and others then sued the Attorney General, arguing that the CSA's prohibition on their intrastate medical marijuana activities was outside the federal government's Commerce Clause authority, among other arguments. *Id.* at 7. After the Ninth Circuit ordered that a preliminary injunction be entered, the Supreme Court took up the case in *Raich*. *Id.* at 8–9.

In *Raich*, the Supreme Court framed the question of whether Congress can regulate intrastate marijuana as a Necessary and Proper Clause issue: "whether the power vested in Congress by Article I, § 8, of the Constitution '[t]o make all Laws which shall be necessary and proper for carrying into Execution' its authority to

'regulate Commerce with foreign Nations, and among the several States' includes the power to prohibit the local cultivation and use of marijuana in compliance with California law." *Id.* at 5 (brackets in original) (quoting U.S. Const., art. I, § 8). The Court determined that the CSA's prohibition on intrastate marijuana commerce was a proper exercise of the Necessary and Proper Clause because: (1) Congress "sought to eradicate" marijuana in interstate commerce; (2) Congress had determined that permitting state-regulated marijuana would leave a "gaping hole in the CSA," and (3) that determination was supported by specific Congressional findings, which findings were consistent with the record on the preliminary injunction motion. *Id.* at 19 n.29, 20, 22. The Supreme Court therefore reversed the Ninth Circuit, eliminating the injunction against enforcing the CSA.

After *Raich*, however, Congress abandoned its former goal of eradicating marijuana from interstate commerce. In 2010, Congress permitted the District of Columbia to enact a medical marijuana program, the same kind of program that *Raich* had prohibited in California. A23 (Compl. ¶ 24). The following year, and in a much bigger step away from the policy of federal eradication, then-Deputy Attorney General James Cole issued a memorandum stating that it was not a priority for the Department of Justice ("DOJ") to prosecute persons who were acting in compliance with state-regulated marijuana regimes. A23 (Compl. ¶ 26). In 2014, Congress transformed this DOJ policy into legislation by enacting the Rohrabacher-

Farr Amendment, which bars the DOJ from enforcing the CSA against persons participating in state-regulated medical marijuana programs. A23 (Compl. ¶ 25). Congress has renewed the Rohrabacher-Farr Amendment every year since. *Id.*

The reason why Congress has moved away from its policy of eradication is that the vast majority of states have adopted, typically in response to ballot initiatives, sophisticated and detailed regulatory programs for permitting and regulating medical and/or adult-use marijuana. Thirty-eight states, including Massachusetts, authorize medical marijuana, and most of those states, covering the majority of the U.S. population, authorize adult-use marijuana. A16, 34 (Compl. ¶¶ 8, 55). This state-regulated marijuana is "grown, harvested, packaged, and sold within a single state, without entering into interstate commerce" and is subject to "labelling and tracking requirements" that both differentiate regulated marijuana products "from each other and from illicit interstate marijuana" and prevent diversion. A16, 21–22 (Compl. ¶¶ 7, 22). These programs have significantly reduced the amount of marijuana in interstate commerce, as customers switch to purchasing state-regulated, locally cultivated marijuana over illicit marijuana that has travelled in interstate commerce. A43 (Compl. ¶¶ 76–77). For example, marijuana seized at the border—previously the main conduit for marijuana into the United States—has dropped by 95% over the last decade. A43 (Compl. ¶ 77).

Plaintiffs-Appellants in this case are participants in Massachusetts' marijuana

program. They operate businesses that grow, process, transport, and sell marijuana entirely in Massachusetts and in full compliance with state law. A13–15, 25–30 (Compl. ¶¶ 1–5, 32–45).

### B. Procedural History.

Plaintiffs-Appellants filed their Complaint on October 26, 2023. A13. Defendant-Appellee Merrick Garland filed his Motion to Dismiss on January 23, 2024. A55. After hearing oral argument on May 22, 2024, the district court, on July 1, entered an order granting Defendant-Appellee's motion. ADD1.

In the order, Judge Mastroianni correctly concluded that Plaintiffs-Appellants have standing because (a) they face a "credible threat of prosecution" and (b) they have suffered "economic injuries" that are "fairly traceable" to the "risks and uncertainties the CSA imposes on transactions with state-regulated marijuana businesses." ADD8–11. The district court also held that "the Complaint has alleged persuasive reasons for a reexamination of the way the Controlled Substances Act ('CSA') regulates marijuana." ADD2.

The district court nonetheless concluded that it lacked authority to consider those arguments and that its role was limited to "inquiring only whether Congress could rationally conclude the plaintiffs' conduct had a substantial affect on interstate commerce, rather than whether the plaintiffs could prove that it did not." ADD12.

On Plaintiffs-Appellants' Fifth Amendment claim, the Court held that it was

governed by *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022), but dismissed the claim without engaging with the historical analysis in the Complaint as required by *Dobbs.* ADD14–15.

Plaintiffs-Appellants timely filed their notice of appeal on July 3, 2024. A142.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Abdallah v. Bain Cap. LLC*, 752 F.3d 114, 119 (1st Cir. 2014). "In so doing, we accept the well-pleaded facts as true and draw all inferences in favor of" Plaintiffs-Appellants. *Irizarry v. United States*, 427 F.3d 76, 77 (1st Cir. 2005).

## SUMMARY OF ARGUMENT

Massachusetts is one of thirty-eight states where consumers have access to safe and regulated marijuana. This state-regulated marijuana is cultivated, transported, and sold for medical or adult use all without crossing state lines. A16 (Compl. ¶ 7). Plaintiffs-Appellants farm, transport, and sell regulated marijuana in Massachusetts, but Defendant-Appellee Garland deems those activities illegal under the federal Controlled Substances Act ("CSA"). Plaintiffs-Appellants sued, alleging that Defendant-Appellee's threatened enforcement of the CSA against intrastate marijuana exceeds Congress's authority and violates the Fifth Amendment. The district court concluded that Plaintiffs-Appellants "alleged persuasive reasons for a

reexamination of" the CSA but held that it was constrained by *Gonzalez v. Raich*, 545 U.S. 1 (2005), to dismiss the Complaint. ADD2.

That was error because (1) the district court did not consider whether the CSA's ban on state-regulated marijuana was, given Congress's recent legislation, necessary and proper to achieving any *current* Congressional interstate goal regarding marijuana—it is not; and (2) the district court's Fifth Amendment analysis did not consider the Complaint's allegations of pre-Founding and 19th Century American history regarding marijuana, allegations that establish a long-held recognition of the value of marijuana commerce.

*First*, the Complaint plausibly alleges that the CSA's prohibition on state-regulated marijuana today fails under *Raich*'s Necessary and Proper Clause standard for determining when Congress may regulate local commerce. The federal government possesses only those powers granted by the Constitution, including the power to regulate interstate commerce, but not "the exclusively internal commerce of a State." *United States v. Lopez*, 514 U.S. 549, 553 (1995) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 194–95 (1824)). By "withholding from Congress a plenary police power," the Constitution confirms that Congress cannot regulate local activity merely on the basis that the regulation promotes the public good or general welfare. *Id.* at 566. Per *Raich*, Congress can regulate local activities only as part of its "authority to 'make all Laws which shall be *necessary and proper*' to 'regulate

9

Commerce among the several States.'"  545 U.S. at 22 (emphasis added) (internal ellipses omitted) (quoting U.S. Const. art. I, § 8).

In dismissing the Complaint, the district court relied on *Raich* but ignored the requirements of the Necessary and Proper Clause that *Raich* itself affirmed.  The district court appears to have erroneously interpreted *Raich* as permitting Congress to regulate local activities that substantially affect interstate commerce, regardless of whether those activities interfere with interstate commerce or with Congress's regulation thereof.  For example, the district court concluded that Congress could prohibit state-regulated marijuana because Plaintiffs-Appellants, for example, "consume utilities" and "recruit and train employees," regardless of whether those activities have anything to do with the Congress's interstate marijuana goals.  ADD13.  The Necessary and Proper Clause, however, requires more than simply "pretext."  *Artis v. D.C.*, 583 U.S. 71, 90 (2018) (quoting *Jinks v. Richland Cnty., S.C.*, 538 U.S. 456, 464 (2003)).

To be "necessary" within the meaning of that clause, courts have emphasized that Congress's regulation must be "plainly adapted" to implementing Congress's delegated authority.  *McCulloch v. Maryland,* 17 U.S. 316, 421 (1819).  This "plainly adapted" standard requires that "the means chosen are reasonably adapted to the attainment of a legitimate end under the commerce power or under other powers that the Constitution grants Congress the authority to implement."  *United States v.*

10

*Comstock*, 560 U.S. 126, 135 (2010) (internal quotations omitted) (quoting *Raich*, 545 U.S. at 37 (Scalia, J., concurring)).  This mandatory "connection between" the local regulation and "Congress' authority" cannot be "too attenuated."  *Artis*, 583 U.S. at 90 (quoting *Jinks*, 538 U.S. at 464), and the regulation must be "really calculated to effect" Congress's enumerated authority, *McCulloch,* 17 U.S. at 423.

The "proper" half of the Necessary and Proper Clause requires that the local regulation be "not prohibited, but consist with the letter and spirit of the constitution."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012).

Twenty years ago, in *Raich*, the Supreme Court applied these standards to conclude that the CSA was a proper exercise of the Necessary and Proper Clause. At the time, Congress's interstate marijuana goal was "eliminating commercial transactions in the interstate market in their entirety."  *Raich*, 545 U.S. at 19. Congress had also determined that it was necessary to regulate all local marijuana commerce to achieve that goal, because permitting intrastate marijuana would leave a "gaping hole in the CSA."  *Id.* at 22.   And Congress had supported that determination with factual findings about the relationship between local and interstate commerce in controlled substances.   Those findings, in turn, were consistent with the record in *Raich*.  *See id.*  These circumstances meant that at the time, Congress's prohibition on intrastate commerce fell within its "authority to 'make all Laws which shall be necessary and proper' to 'regulate Commerce among

11

the several States.'" *Id.* (internal ellipses omitted) (quoting U.S. Const. art. I, § 8).

In the two decades since *Raich*, those crucial legal and factual premises have disappeared. Congress has abandoned its goal of eradicating marijuana and has, in fact, expressly exempted it from federal enforcement in certain circumstances. Congress has also dropped any assumption that federal control of state-regulated marijuana is necessary to prevent a "gaping hole in the CSA." *Id.* at 22. Yet the federal prohibition on state-regulated marijuana nonetheless continues. Now bereft of the interstate goal and findings that justified it in *Raich*, the CSA's ban as applied to state-regulated marijuana cannot be upheld today.

These significant changes in Congress's approach to marijuana were recognized by this Court two years ago, when it held that "the CSA was not Congress's last word on the market in marijuana." *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542, 549 (1st Cir. 2022). After *Raich*, Congress adopted the Rohrabacher-Farr Amendments, which bar the DOJ— the agency tasked with enforcing the CSA—from enforcing the act against state-regulated medical marijuana, meaning that a substantial part of the marijuana in the United States is not subject to any enforceable federal controls. *Id.* at 548. Because "Congress has taken affirmative steps to thwart efforts by law enforcement to shut down that very market," this Court rightly questioned whether "Congress continues to have that intent" "to eradicate" marijuana and concluded that Congress was now

12

"plainly contemplating state regulation of this market." *Id.* at 551–54.

The Rohrabacher-Farr Amendments, together with Congress's decision in 2010 to permit medical marijuana in the District of Columbia, also demonstrate that Congress no longer considers prohibiting state-regulated marijuana to be essential to accomplishing Congress's interstate goals.

Meanwhile, the nation has had over a decade of experience with what in *Raich*'s time was merely a hypothetical: what would happen if a substantial number of people participate in state-regulated marijuana programs. A16, 34 (Compl. ¶¶ 8, 55). The result has not been a swelling of interstate commerce in marijuana, as the CSA had assumed, but a drastic reduction in it—95% by one measure. A21, 43 (Compl. ¶¶ 21, 77). By providing consumers with safe, regulated, and local access to marijuana, Massachusetts and other states have reduced interstate commerce in marijuana, as customers switch to purchasing state-regulated marijuana over illicit interstate marijuana. A43 (Compl. ¶¶ 76–77). It can no longer be assumed, as Congress did in the CSA, that state-regulated marijuana will increase interstate commerce in marijuana.

In short, the intervening years have changed both the legislative regime and the facts underlying *Raich*. When viewed under the proper standard—whether the ban on state-regulated marijuana is "plainly adapted" to achieving Congress's current interstate goals regarding marijuana—Congress's prohibition on state-

13

regulated marijuana cannot be upheld. *Id.*

*Second*, the CSA's prohibition on state-regulated marijuana infringes on Plaintiffs-Appellants' rights and therefore is invalid under the Fifth Amendment. Substantive due process protects "rights that are not mentioned in the Constitution" provided that they are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). In rejecting Plaintiffs-Appellants' Fifth Amendment claim, the district court ignored the long historical record of marijuana cultivation and use in "our Nation's history, legal tradition, and practices." *Glucksberg*, 521 U.S. at 721.

The Complaint establishes that prior to the Founding, marijuana (then called hemp) was promoted by legislation in each of the Thirteen Colonies. A30 (Compl. ¶ 46). The Complaint further alleges the widespread use of marijuana—without federal interference—for both medicinal and recreational use around the adoption of the Fourteenth Amendment. A16 (Compl. ¶ 7). Thus, at both of the critical historical junctures for Due Process analysis—the Founding and the Fourteenth Amendment—marijuana cultivation and marketing were "highly valued," an important factor in identifying fundamental rights. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 770 (2010).

Anglo-American legal protections for marijuana extend back further still at

14

least to the Magna Carta, which created specific legal protections around cultivating and possessing "blada," an English legal category that includes the marijuana plant. The Magna Carta states that "no constable, nor his bailiff" shall seize "blada" without payment for the same, with "blada" meaning "all manner of corne or graine, or things annuall coming by the industry of man, as *hemp*, flax, & c." Edward Coke, *The Second Part of the Institutes of the Laws of England*, Magna Carta, ch. XIX, at 33 (1797); *id.*, Merton, ch. II, at 81 (emphasis added).

These centuries-old legal traditions are now being continued in the marijuana programs in thirty-eight different states, which recognize the ongoing value of marijuana commerce. Together, both the historical record and these current practices demonstrate the fundamental nature of the right to cultivate, possess, and market marijuana.

In sum, Plaintiffs-Appellants have stated claims for violations of both the Commerce Clause and the Fifth Amendment, and the order dismissing the Complaint should be reversed.

## **ARGUMENT**

### I.    **The CSA's Prohibition on State-Regulated Marijuana Is Not Necessary and Proper to Achieving any Current Congressional Interstate Goal.**

Plaintiffs-Appellants challenge the constitutionality of the CSA as-applied to the cultivation, possession, and distribution of state-regulated marijuana. *Raich* provides that this challenge must be assessed under the Necessary and Proper

15

Clause, 545 U.S. at 5, but the significant legislative changes since *Raich* mean that the federal marijuana regime the Supreme Court encountered in 2005 no longer exists.  Because of these legislative changes, *Raich* no longer "directly controls." *Bais Yaakov of Spring Valley v. ACT, Inc.*, 798 F.3d 46, 50 (1st Cir. 2015).  The "constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."  *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 601 (2016) (internal quotations omitted), *abrogated on other grounds by Dobbs*, 597 U.S. at 215.  Unlike the comprehensive marijuana legislation from *Raich*'s time, Congress's current regime cannot justify the CSA's outright ban on state-regulated marijuana.

### A. The Federal Government Lacks a General Police Power and Can Regulate Intrastate Commerce Only When Doing So Is Necessary and Proper to Carrying Out One of the Government's Enumerated Powers.

"In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder."  *Bond v. United States*, 572 U.S. 844, 854 (2014).  The federal government "has no such authority" "to enact legislation for the public good—what we have often called a 'police power.'"  *Id.* (quoting *Lopez*, 514 U.S. at 567).

The Constitution therefore forbids Congress from exercising "a plenary police power that would authorize enactment of every type of legislation" over the states, *Lopez*, 514 U.S. at 566, and does not permit Congress to "create a completely

16

centralized government," *id.* at 557. Instead, Congress is limited to its enumerated powers, including the Commerce Clause power to regulate commerce "among the several States," "with foreign Nations," and "with the Indian Tribes." U.S. Const. art. I, § 8. By expressly delegating three categories of commerce regulation to Congress, Article I's "enumeration presupposes something not enumerated; and that something, if we regard the language, or the subject of the sentence, must be the exclusively internal commerce of a State." *Lopez*, 514 U.S. at 553 (quoting *Gibbons*, 22 U.S. at 194–95)); *see Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 173 (2001) ("The grant of authority to Congress under the Commerce Clause, though broad, is not unlimited.").

Because Congress's Commerce Clause power does not include local commerce, Congress's power "extends to those activities intrastate" only when permitted under the Necessary and Proper Clause: Congress's authority "to make all laws which shall be necessary and proper for carrying into Execution" its enumerated powers. *Katzenbach v. McClung*, 379 U.S. at 301–02 (1964).

*Raich* therefore framed the "question" of whether Congress can regulate state-regulated marijuana as being "whether the power vested in Congress by Article I, § 8, of the Constitution '[t]o make all Laws which shall be necessary and proper for carrying into Execution' its authority to 'regulate Commerce with foreign Nations, and among the several States' includes the power to prohibit" state-regulated

17

marijuana.  545 U.S. at 5 (brackets in original).  Today, that remains the critical question: whether the CSA's ban on state-regulated marijuana remains necessary and proper to carrying out Congress's *current* interstate goals.  *See Bond*, 572 U.S. at 854 ("A criminal act committed wholly within a State 'cannot be made an offence against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States.")

> **1.  To Satisfy the Necessary and Proper Clause, Congress's Regulation of Local Commerce Must Be Plainly Adapted to Achieving an Interstate Commerce Goal and Consistent with Federalism.**

The requirements of the Necessary and Proper Clause were established over two hundred years ago in *McCulloch v. Maryland*: when Congress legislates to carry out a delegated power, the means chosen must be necessary, meaning "plainly adapted to that end"; and proper, meaning consistent "with the letter and spirit of the constitution."  17 U.S. at 421; *see, e.g.*, *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 537 (citing *McCulloch*).

Where, as here, the government seeks to justify a local regulation of commerce, the "plainly adapted" aspect of the Necessary and Proper Clause requires that "the means chosen are reasonably adapted to the attainment of a legitimate end under the commerce power."  *Comstock*, 560 U.S. at 134–35 (first quoting *McCulloch*, 17 U.S. at 421, then quoting *Raich*, 545 U.S. at 37 (Scalia, J., concurring)).  The Supreme Court has "made clear that, in determining whether the

18

Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134.

This "means-end rationality" standard under the Necessary and Proper Clause, *id.* at 143 (internal quotations omitted), imposes specific requirements not present in typical rational basis review. To be "plainly adapted," Congress's regulation cannot be "pretext for the accomplishment of objects not entrusted to" Congress. *Artis*, 583 U.S. at 90 (quoting *Jinks* 538 U.S. at 464). This requirement mandates that the statute be "*really calculated* to effect any of the objects intrusted to the government." *McCulloch*, 17 U.S. at 423 (emphasis added).

Additionally, the "plainly adapted" requirement does not permit regulation based on just *any* rational connection to Congress's chosen regulation and its enumerated powers. *Artis*, 583 U.S. at 90. The means chosen cannot be "too attenuated" from Congress's delegated authority. *Id.* (quoting *Jinks* 538 U.S. at 464); *see id.* (upholding federal tolling statute at 28 U.S.C. § 1367 where there was no "reason to believe that the connection between § 1367(d) and Congress' authority over the federal courts was too attenuated").

For example, the Supreme Court has cited *Lopez* and *United States v. Morrison*, 529 U.S. 598 (2000), as cases where the plainly adapted requirement of

19

the Necessary and Proper Clause was not satisfied: the connection to the delegated power was "so attenuated as to undermine the enumeration of powers set forth in Article I, § 8." *See Jinks*, 538 U.S. at 464.

In *Lopez*, the government had argued that Congress could regulate "possession of a firearm in a school zone," because gun possession "may result in violent crime and that violent crime can be expected to affect the functioning of the national economy." 514 U.S. at 563. The Supreme Court rejected that reasoning because it would permit Congress to regulate "all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." *Id.* at 564. In *Morrison*, the Supreme Court struck down the Violence Against Women Act and reiterated that Congress cannot regulate local activities based on an "attenuated effect upon interstate commerce," regardless of whether that effect is documented in Congressional findings and "substantial." 529 U.S. at 615. While neither *Lopez* nor *Morrison* mentioned the Necessary and Proper Clause, *Jinks* confirmed that their bar against "attenuated" links to interstate commerce derives from the Necessary and Proper Clause. 538 U.S. at 464.

Even if Congress's chosen regulation meets all these requirements, the "proper" half of the Necessary and Proper clause requires additionally that such regulation must be "not prohibited, but consist with the letter and spirit of the constitution." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 537. Per this rule, Congress

20

may not use the Necessary and Proper clause to enact "a great substantive and independent power, which cannot be implied as incidental to other powers, or used as a means of executing them." *McCulloch*, 17 U.S at 411. Examples of such powers are "the power of making war, or levying taxes, *or of regulating commerce*." *Id.* (emphasis added). Thus, the Necessary and Proper Clause "does not license the exercise of any 'great substantive and independent power[s]' beyond those specifically enumerated." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 559 (Roberts, C.J., concurring) (brackets in original). Legislation under this clause "must not stray past the boundaries of our system of federalism." *United States v. Volungus*, 595 F.3d 1, 9 (1st Cir. 2010). "The decisive consideration is whether the federal scheme is 'duly guarded' and sufficiently respectful of state sovereignty," which means that it "intrudes no further into the field" of the states' police power "than is reasonably necessary." *Id.*

## 2. The Necessary and Proper Clause Permits Congress to Regulate Local Commerce Only Where the Local Activities Interfere with Interstate Commerce or Congress's Regulation Thereof.

As the above cases demonstrate, the Supreme Court has continued to police the "outer limits" of Congress's authority under the Commerce Clause and Necessary and Proper Clause, even in its "modern-era precedents." *Lopez*, 514 U.S. at 556–57. These cases have permitted Congress to regulate local commerce only in two types of circumstances. First, Congress can regulate those "intrastate

21

activities that 'have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions." *Id.* at 555 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937). Second, Congress can regulate those intrastate activities that "in a substantial way interfere with or obstruct the exercise of the granted power" to regulate interstate commerce. *Id.* at 556 (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942)); *see Wickard v. Filburn*, 317 U.S. 111, 124 (1942) (explaining that Congress's authority "extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce").

### a. Congress Can Regulate Local Commerce That Substantially Burdens or Obstructs Interstate Commerce.

The first category of these cases presents the simplest path for justifying Congress's regulation of intrastate commerce: if local commercial activities substantially "tend to disturb or obstruct interstate commerce," Congress has the authority to remove that threat. *United States v. Darby*, 312 U.S. 100, 119 (1941).

This category is exemplified by Congress's laws against racial discrimination by motels and restaurants serving travelers. Because "discrimination in restaurants" "discourages travel and obstructs interstate commerce," Congress properly found it "necessary to interfere" with those local commercial activities. *Katzenbach*, 379

22

U.S. at 299–302.  Likewise, because interstate travelers often require temporary lodging, Congress can bar discrimination at motels to counter the "disruptive effect that racial discrimination has had on commercial intercourse."  *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 257 (1964).

Other examples include:

- a federal ban on local loansharking activities, because loansharking is integral to "organized interstate crime," which in turn burdens interstate commerce, *Perez v. United States*, 402 U.S. 146, 155–57 (1971);

- federal fair labor standards on manufacturing, imposed to "protect interstate commerce from the paralyzing consequences of industrial war," *Jones & Laughlin Steel Corp.*, 301 U.S. at 41; *see Darby*, 312 U.S. at 119 (explaining that Congress can regulate labor practices, because strikes "tend to disturb or obstruct interstate commerce"); and

- federal restrictions on converting prime farmland into mines, because "the protection of prime farmland is a federal interest that may be addressed through Commerce Clause legislation," *Hodel v. Indiana*, 452 U.S. 314, 318–19, 324–25 & n.11 (1981).

In contrast, *Lopez* and *Morrison* are cases where the government *sought* to justify local regulation on the grounds that the activity being regulated substantially threatened interstate commerce, but the Court determined that those threats were too attenuated, and thus the Necessary and Proper Clause's requirements could not be met.  *See* Part I.A.1, *supra*.

### b.  Congress Can Regulate Local Commerce That Substantially Interferes with or Obstructs Congress's Regulation of Interstate Commerce.

The other instance in which Congress can regulate local commerce is when

the local activities interfere with or obstruct not interstate commerce itself, but Congress's regulation thereof. In these cases, Congress's control over local commerce is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Raich*, 545 U.S. at 24.

The federal quotas on wheat production in *Wickard* are the prime example of this category. *See Lopez*, 514 U.S. at 560 (explaining that *Wickard* "is perhaps the most far reaching example of Commerce Clause authority over intrastate activity"). Wheat itself poses no threat to interstate commerce. However, unregulated wheat production threatened Congress's goal of imposing interstate price controls on wheat: "It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions," and would therefore interfere with Congress's goal "to increase the market price of wheat." *Wickard*, 317 U.S. at 128.

*Raich* confirmed that *Wickard* is a Necessary and Proper Clause case, stating, "Thus, as in *Wickard*, when it enacted comprehensive legislation to regulate the interstate market in a fungible commodity, Congress was acting well within its authority to 'make all Laws which shall be necessary and proper' to 'regulate Commerce among the several States.'" 545 U.S. at 22 (original ellipsis omitted); *see id.* at 19 ("In *Wickard*, we had no difficulty concluding that Congress had a

24

rational basis for believing that, when viewed in the aggregate, leaving *home-consumed wheat outside the regulatory scheme would have a substantial influence on price and market conditions*." (emphasis added)).

*Raich*'s extended analysis of *Wickard* underscores an important aspect of the Necessary and Proper Clause in that type of case. Justifying a local regulation on *Wickard* grounds requires a more extensive showing than in cases where the local activity directly threatens interstate commerce. The *Wickard* category requires an analysis of the local activity, of Congress's interstate regulatory scheme, and of the interaction between the two, *i.e.*, that the local activities "affect adversely the congressional regulation" of interstate commerce. *Wrightwood Dairy Co.*, 315 U.S. at 121. Only after such analysis can it be concluded that "control over intrastate transactions" is "necessary and appropriate to make the regulation of the interstate commerce effective." *Id.* (holding that Congress can regulate the "marketing of intrastate milk" to make interstate price regulations effective); *see Hodel*, 452 U.S. at 281–82 (holding that local "surface mining and reclamation standards are essential in order to insure that competition in interstate commerce among sellers of coal produced in different States" does not undermine Congress's environmental goals).

A district court recently summarized these requirements when it struck down a federal ban on home distilleries as exceeding Congress's Commerce Clause and Necessary and Proper Clause authority. *See Hobby Distillers Ass'n v. Alcohol &*

25

*Tobacco Tax & Trade Bureau*, 2024 WL 3357841, at \*14 (N.D. Tex. July 10, 2024). There must be a showing (1) that the activity "*substantially affects interstate commerce in the aggregate*;" (2) that Congress's regulation of that activity *"serves a comprehensive statute that regulates commercial activity on its face*;" and (3) that the regulation *"is necessary to make that broader commercial regulation effective*." *Id.* (emphasis added).

### B. In *Raich*, the CSA's Prohibition on State-Regulated Marijuana Satisfied the Necessary and Proper Clause, Because Congress Then Intended to Eradicate Marijuana and Had Determined That Banning State-Regulated Marijuana Was Essential to That Goal.

*Raich* falls into the second category of Congressional regulation of local commerce. Like the wheat in *Wickard*, marijuana does not inherently threaten interstate commerce. *Raich* instead upheld the CSA's prohibition as applied to state-regulated marijuana because it was "an essential part of the larger regulatory scheme" Congress had devised for regulating interstate marijuana. 545 U.S. at 27. This reasoning had three critical parts: identifying Congress's interstate goal; identifying the link Congress drew between that goal and its regulation of intrastate commerce; and assessing whether that connection was supported.

### 1. When *Raich* Was Decided, Congress's Goal Was to Create a Comprehensive Scheme Prohibiting All Interstate Transactions in Marijuana.

*Raich* explained that "a primary purpose of the CSA is to control the supply and demand of controlled substances in both lawful and unlawful drug markets."

545 U.S. at 19; *see id.* at 12–13 ("The main objectives of the CSA were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances.  Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels."  (footnotes omitted)).

"*To effectuate these goals*, Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance *except in a manner authorized by the CSA*."  545 U.S. at 13 (emphasis added); *id.* at 27 ("Moreover, the CSA is a comprehensive regulatory regime specifically designed to regulate which controlled substances can be utilized for medicinal purposes, and in what manner.").

As to marijuana specifically, Congress placed the plant on Schedule I of the CSA, meaning that "Congress sought to eradicate" it from interstate commerce, thereby "eliminating commercial transactions in the interstate market in their entirety." *Id.* at 19 & n.29.

*Raich* also deemed it important that "the CSA would still impose controls" over marijuana, even if marijuana were moved to a different schedule.  *Id.* at 27. Whether marijuana remained in Schedule I (for substances with no medical use) or moved to Schedule II–V (substances with recognized medical uses), *Raich* concluded that the CSA would require "compliance with specific production quotas, security controls to guard against diversion, recordkeeping and reporting

27

obligations, and prescription requirements," *i.e.*, Congress sought to control the entire marijuana supply chain, regardless of whether it had a recognized medical use. *Id.*; *see id.* at 14 ("Each schedule is associated with a distinct set of controls regarding the manufacture, distribution, and use of the substances listed therein. The CSA and its implementing regulations set forth strict requirements regarding registration, labeling and packaging, production quotas, drug security, and recordkeeping." (citation omitted)).

Thus, for the first step in the Necessary and Proper Clause analysis—identifying the congressional interest, or as *Raich* put it, the "goals" Congress sought to "effectuate"—Congress's relevant goal at the time of *Raich* was to eliminate, and at the very least to control, all interstate transactions in marijuana. *Id.* at 13.

### 2. When *Raich* Was Decided, Congress Believed that Prohibiting Interstate Marijuana Was Essential to Congress's Interstate Goal of Eliminating Marijuana.

After setting out Congress's goal under the CSA, *Raich* explained Congress's belief that state-regulated marijuana would substantially interfere with or obstruct that goal: federal "control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents." *Id.* at 12 n.20 (quoting 21 U.S.C. § 801). Congress, when *Raich* was decided, was still "believing that failure to regulate the intrastate manufacture and possession of marijuana *would leave a gaping hole in the CSA*," *id.* at 22 (emphasis added), thereby

28

creating an "unquestionably substantial" effect on Congress's interstate goal of controlling marijuana, *id.* at 32.

### 3. When *Raich* Was Decided, Congress's Findings about State-Regulated Marijuana Were Supported by the Then-Undisputed Facts.

Finally, *Raich* concluded that there was support for Congress's determination that state-regulated marijuana would substantially interfere with Congress's goal of eliminating marijuana in interstate commerce. The Court reached this conclusion because Congress had made specific findings supporting the notion that controlling intrastate marijuana was "essential to the effective control of the interstate incidents" of marijuana, most importantly: local "distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances"; and controlled substances "cannot be differentiated from controlled substances manufactured and distributed interstate," such that permitting intrastate marijuana would create difficulties in enforcing the CSA against interstate marijuana. *Id.* at 12 n.20 (quoting 21 U.S.C. § 801). These "findings by Congress," the Court held, "established the causal connection between the production for local use and the national market." *Id.* at 20.

The Court then determined that these findings "in the introductory sections of the CSA" were consistent with the record before it. *Id.* All "the submissions of the parties and the numerous *amici* all seem to agree that the national, and international,

market for marijuana has dimensions that are fully comparable to those defining the class of activities regulated by the Secretary pursuant to the 1938 statute" in *Wickard*, where local wheat production was held to interfere with Congress's regulation of interstate wheat prices. *Id.* at 21. Based on that record, the Court found marijuana to be a "fungible" commodity like wheat, thereby supporting Congress's findings "about diversion into illicit channels." *Id.* at 22. The Court also determined that the apparent fungibility of state-regulated and illicit marijuana supported Congress's findings about "enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere." *Id.* The Court therefore held it was proper for Congress to conclude that state-regulated marijuana "was an essential part of the larger regulatory scheme" to control, and ultimately eliminate, marijuana from interstate commerce. *Id.* at 27.

## C. The Legislative and Operative Facts That Were Material in *Raich* Have Changed Dramatically, and the CSA's Prohibition on State-Regulated Marijuana Can No Longer Be Upheld Under the Necessary and Proper Clause.

### 1. Congress Has Abandoned Both Its Goal of Controlling Marijuana and Its Finding That Prohibiting State-Regulated Marijuana Is Essential to the CSA.

In the nearly twenty years since *Raich* was decided, Congress has taken multiple steps to dismantle the "comprehensive regime" that had justified the CSA's prohibition on state-regulated marijuana in *Raich*. *Id.* at 12.

In 2010, Congress permitted Washington D.C. to adopt a medical marijuana

30

program, thereby bringing marijuana into Congress's backyard.  A23 (Compl. ¶ 24).

Starting in 2014, and in each year thereafter, Congress has enacted the Rohrabacher-

Farr Amendment, A23 (Compl. ¶ 25), which bars the DOJ from taking actions that

would "prevent any" state "from implementing their own laws that authorize the use,

distribution, possession, or cultivation of medical marijuana." *Ne. Patients Grp.*, 45

F.4th at 548.  Today, the Rohrabacher-Farr Amendment is "no anomaly"; it is a

pervasive part of Congress's marijuana regime, having been included "in every

annual congressional appropriation" bill since it first appeared.  *Id.*

In *Ne. Patients Grp.*, this Court recognized that the Rohrabacher-Farr

Amendments represent a departure from Congress's legislative goals for marijuana

as they existed in *Raich*'s time.  *Ne. Patients Grp.* concerned a dormant Commerce

Clause challenge to Maine's residency requirement for directors and officers of

marijuana dispensaries.  *Id.* at 544.  Proponents of the residency restriction had

argued that because the CSA made marijuana illegal, Maine was free to discriminate

against interstate actors seeking to participate in Maine's marijuana program.  *Id.* at

548, 550.  This Court, however, held that Congress's treatment of marijuana could

not be gleaned merely by looking at the CSA as "the CSA was not Congress's last

word on the market in marijuana."  *Id.* at 549.

Specifically, Congress passed the Rohrabacher-Farr Amendments.  *Id.*  These

enactments undermine any notion that "Congress continues to have that intent" "to

31

eradicate" marijuana and instead show that Congress is now "plainly contemplating state regulation of this market." *Id.* at 551, 554. Rather than continuing its efforts to eliminate marijuana, "Congress has taken affirmative steps to thwart efforts by law enforcement to shut down that very market, through the annual enactment of the Rohrabacher-Farr Amendment." *Id.* at 553. As *Ne. Patients Grp.* explains, the amendments demonstrate that "Congress contemplates both *that an interstate market in medical marijuana may exist that is free from federal criminal enforcement and that, if so, this interstate market may be subject to state regulation*." *Id.* at 549 (emphasis added). The Court therefore held that the federal marijuana regime did not provide Maine *carte blanche* to discriminate against out-of-state individuals seeking to participate in Maine's marijuana programs. *Id.* at 549–50.

*Ne. Patients Grp.* thus shows that Congress is no longer operating under the goal of eliminating, or even controlling, all interstate marijuana. The current federal regime is far removed from that of *Raich*'s time, which contemplated "comprehensive regulatory" control of marijuana "even if respondents are correct that marijuana does have accepted medical uses." 545 U.S. at 27. The Rohrabacher-Farr Amendments have turned that regime on its head. Instead of seeking to control all intrastate marijuana, Congress contemplates an ongoing "interstate market in medical marijuana" and seeks to "to free the market in medical marijuana from being subject to the full degree of federal criminal enforcement." *Id.* at 548, 555.

Importantly, the amendments put marijuana in a unique position compared to every other controlled substance. Every other controlled substance, when used for medical purposes, is subject to exhaustive federal control at each stage of the supply chain. *Raich*, 545 U.S. at 27. With the Rohrabacher-Farr Amendments, however, state-regulated medical marijuana is not subject to any enforceable federal controls under the CSA, removing from medical marijuana the very controls that were the "primary purpose" of that statute. *Id.* at 19. Put differently, the Rohrabacher-Farr Amendments have led to a federal regime *without* comprehensive federal control over marijuana—one where medical marijuana that conforms to state regulations is "free from federal criminal enforcement," making it less regulated, from a federal perspective, than even the most lightly-regulated Schedule V substance, despite marijuana remaining on Schedule I. *Ne. Patients Grp.* 45 F.4th at 553.

The amendments also demonstrate that Congress no longer believes that prohibiting state-regulated marijuana is an "essential part of the larger regulatory scheme." *Raich*, 545 U.S. at 27. Instead of seeking to prohibit and control all state-regulated marijuana, the amendments expressly provide for marijuana that is "*subject only* to state regulation." *Ne. Patients Grp.* 45 F.4th at 553 (emphasis added). Where Congress previously found that "it is not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate," *Raich*,

33

545 U.S. at 12 n.20, the amendments demonstrate the opposite: that state-regulated marijuana can co-exist with federal enforcement of interstate marijuana. The amendments thus show that Congress does not consider there to be any substantial difficulty associated with enforcing the CSA against illicit interstate marijuana while exempting state-regulated marijuana.

### 2. The Two Decades Since *Raich* Have Proven That State-Regulated Marijuana Does Not Substantially Interfere with Federal Regulation of Interstate Marijuana.

Congress's legislative actions since *Raich*, standing alone, are sufficient to require a new analysis of whether the federal marijuana regime is constitutional. But those were not the only material changes since *Raich.* Starting with the Cole Memo in 2013, DOJ officials in the Obama, Trump, and Biden administrations have stated that prosecuting state-regulated marijuana activities is not a priority of the federal government. A23 (Compl. ¶ 26). Meanwhile, dozens of states have enacted medical marijuana and adult-use marijuana programs. A16, 34 (Compl. ¶¶ 8, 55). The nation now has over a decade of recent experience showing what happens in the interstate market for marijuana when state-regulated marijuana is largely left to the states.

The results are not merely inconsistent with Congress's findings in the CSA, they are so drastically different as to render those findings no longer valid. Congress had found that "*Local* distribution and possession of controlled substances contribute to *swelling the interstate* traffic in such substances." *Raich*, 545 U.S. at 12 n.20

(emphasis added).  But we now know that the rise in state-regulated marijuana has been accompanied by a massive reduction in interstate commerce in marijuana.  For example, since 2012, there has been a 95% reduction in the amount of marijuana seized by Customs, even as seizures of other drugs have increased.  A21, 43 (Compl. ¶¶ 21, 76).  The reason for this reduction is that marijuana smuggled in from abroad (and then dispatched through interstate commerce) is not as desirable to consumers, now that they have the option of safe, regulated marijuana available from local channels. A35, 43 (Compl. ¶¶ 58, 76–77).

The intervening decades have also rendered misplaced Congress's former concerns about enforcement difficulties.  Today, "state-regulated marijuana products are distinguishable (from each other and from illicit interstate marijuana) based on the labelling and tracking requirements that states impose."  A21–22 (Compl. ¶ 22).  In Massachusetts, for example, there is "a transparent and accountable record for tracing marijuana products through every stage of their processing"—"from seed to sapling and mature plant, from processing to wholesale distribution, from transit to stocking at the dispensary, and from inventory at dispensaries to its ultimate sale to consumers."  A37–40, 42 (Compl. ¶¶ 62–68, 72).  These controls mean that state-regulated marijuana is not fungible with illicit marijuana, and that the federal government can distinguish between the two when enforcing the CSA.

### 3. Today's Federal Marijuana Regime Fails Under the *Raich* Test.

The myriad changes, both in federal legislation and the markets for marijuana, mean that the new marijuana regime today cannot satisfy the standard set out in *Raich*. To reiterate: *Raich*'s holding was premised on three aspects of the CSA: (1) Congress's goal of eliminating all marijuana; (2) Congress's conclusion that regulating state-regulated marijuana was essential to controlling interstate marijuana; and (3) Congress's findings that state-regulated marijuana created diversion risks and enforcement difficulties.

*First*, the Rohrabacher-Farr Amendments, together with the adoption of medical marijuana in Washington D.C., show that Congress has abandoned its goal of controlling all marijuana in interstate commerce. *See* Part I.B.1, *supra*. Congress's "closed regulatory system" for marijuana during *Raich*'s time no longer exists. 545 U.S. at 13. In its place is a "contradictory" "half-in, half-out regime that simultaneously tolerates and forbids local use of marijuana." *Standing Akimbo, LLC v. United States*, 141 S. Ct. 2236, 2236–37 (2021) (statement of Thomas, J., respecting denial of certiorari); *see United States v. Guess*, 216 F. Supp. 3d 689, 695 (E.D. Va. 2016) (referring to the current federal marijuana regime as "an untenable grey area").

The current regime therefore lacks the comprehensiveness that was a predicate for *Raich*'s upholding of the CSA. *See* 545 U.S. at 27. When Congress's

goal was eliminating, or at the very least controlling, *all* marijuana, it was rational to conclude that substantial local commerce in marijuana would necessarily undermine that comprehensive regime. With the current "half-in, half-out regime," *Standing Akimbo, LLC*, 141 S. Ct. at 2236–37 (statement of Thomas, J., respecting denial of certiorari), there is no reason to assume that local commerce will obstruct or interfere with it. While the CSA still regulates marijuana, "it is not the *comprehensive* kind that justifies Congressional regulation of local behavior, like in *Wickard* and *Raich*." *Hobby Distillers Ass'n*, 2024 WL 3357841, at *15 (emphasis in original). In *Hobby Distillers*, Congress's alcohol regulation was held to be "not a 'comprehensive' scheme of regulation because there are many aspects of the alcohol industry that Congress has left untouched." *Id.* With the Rohrabacher-Farr Amendments, the same is true of Congress's marijuana regulation.

*Second*, the Rohrabacher-Farr Amendments show that not even Congress believes that prohibiting state-regulated marijuana is "essential to the effective control of the interstate incidents" of marijuana. *Raich*, 545 U.S. at 12 n.20 (quoting 21 U.S.C. § 801). *See* Part I.B.1, *supra*. Because the original reasoning behind the CSA "played no role in shaping the statutory formula before us today," that reasoning cannot be used to justify the current federal marijuana regime. *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 554 (2013). Now that Congress itself believes that state-regulated marijuana can, and should, co-exist with the CSA, it cannot be

said that state-regulated marijuana is "an essential part of the larger regulatory scheme." *Raich*, 545 U.S. at 24. Therefore state-regulated marijuana commerce is no longer something with which it is "necessary to interfere for the purpose of executing" Congress's interstate goals. *Katzenbach*, 379 U.S. at 299–302.

*Third*, even if Congress had not abandoned its findings in the CSA as applied to state-regulated marijuana, the decades since *Raich* have shown Congress's former concerns about swelling interstate traffic and enforcement difficulties can no longer be supported. When *Raich* upheld the CSA, it did so based on "findings by Congress" that establish the "causal connection between the production for local use and the national market." 545 U.S. at 20. Those findings included that local marijuana activities "contribute to swelling the interstate traffic" in marijuana. *Id.* at 12 n.20 (quoting 21 U.S.C. § 801); *see id.* at 22 (crediting Congress's "concerns about diversion into illicit channels"). Today, these findings cannot stand. The Complaint alleges in detail how most of the country now has access to local, state-regulated marijuana and that this intrastate marijuana unquestionably reduces, not increases, interstate marijuana: by one government measure the reduction is 95%. A43 (Compl. ¶¶ 76–77).

The other finding on which *Raich* premised the requisite "causal connection" for the Necessary and Proper Clause was Congress's concern that if state-regulated marijuana were unregulated federally, it would create "enforcement difficulties that

38

attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere." 545 U.S. at 20–22. Here too, the Complaint's allegations show that finding does not withstand scrutiny today. While state-regulated marijuana at issue in *Raich* consisted of plants homegrown by patients or their caregivers, today state-regulated marijuana is subject to strict labelling and tracking that differentiates regulated plants from illicit growth. A21–22 (Compl. ¶ 22). Indeed, the Rohrabacher-Farr Amendments are designed around the belief that state-regulated marijuana is distinguishable from illicit marijuana: the amendments require the DOJ to adhere to that distinction. *See* A23 (Compl. ¶ 25).

Without these findings about swelling interstate traffic and enforcement difficulties, there is no longer any reason to assume that state-regulated marijuana activities "in a substantial way interfere with or obstruct the exercise of the granted power" to regulate interstate commerce in marijuana. *Lopez*, 514 U.S. at 556. The prohibition on state-regulated marijuana thus neither "serves a comprehensive statute that regulates commercial activity on its face" nor *"*is necessary to make that broader commercial regulation effective," and is therefore outside Congress's authority. *Hobby Distillers Ass'n*, 2024 WL 3357841, at *14.

Moreover, the regulation cannot be considered "proper," as today the legislation intrudes "further into the field" of state's police power "than is reasonably necessary." *Volungus*, 595 F.3d at 9. As Congress itself no longer believes that all

state-regulated marijuana must be controlled to achieve Congress's goals, a blanket ban on that marijuana cannot, by definition, be reasonably necessary.

Therefore, the current ban on state-regulated marijuana cannot be justified under the Necessary and Proper Clause.

### D. The District Court Erred by Misstating the *Raich* Standard and Holding That This Standard Permits No Fact-Finding.

#### 1. The District Court Incorrectly Read Raich as Permitting Regulation of Any Local Activity That Substantially Affects Interstate Commerce, Regardless of Whether It Obstructs or Interferes with an Interstate Goal.

The district court read *Raich* as "inquiring only whether Congress could rationally conclude the plaintiffs' conduct had a substantial affect on interstate commerce." ADD12. As a result, the district court determined that the CSA could be validly applied to Plaintiffs-Appellants simply because "they consume utilities and supplies; utilize the internet and a variety of business services; recruit and train employees; and serve consumers, including individuals who travel from other states to obtain marijuana in Massachusetts." ADD13.

The district court's analysis therefore treats the substantial effects test as if it were a freestanding and sufficient test for establishing Congress's authority to regulate local commerce. It is not. The substantial effects test derives from and depends on the Necessary and Proper Clause:

> Article I, s 8, cl. 3, confers upon Congress the power "(t)o regulate Commerce . . . among the several States" and Clause 18 of the same

> Article grants it the power "(t)o make *all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers . . . .*" This grant, as we have pointed out in *Heart of Atlanta Motel* "extends to those activities intrastate *which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end*, the effective execution of the granted power to regulate interstate commerce."

*Katzenbach*, 379 U.S. at 301–02 (emphasis added) (ellipses in original). Because the substantial effects test is a species of the Necessary and Proper Clause, it requires that Congress's regulation of that effect be "plainly adapted" to implementing Congress's delegated authority. *Artis*, 583 U.S. at 90. For that standard to be met, there must be an "appropriate" connection between that purported effect and Congress's regulatory goals, a "rational basis for finding a chosen regulatory scheme necessary to the protection of commerce." *Katzenbach*, 379 U.S. at 302–04. The local activities must "so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means" of accomplishing Congress's Commerce Clause authority. *Wickard*, 317 U.S. at 124.

Divorcing the substantial effects test from the Necessary and Proper Clause, as the district court did, would mean that *any* substantial effect on interstate commerce could justify *any* regulation of local commerce, regardless of whether there is any "means-end rationality" between the two. *Comstock*, 560 U.S. at 134. But the Necessary and Proper Clause forbids "pretext": each regulation under it must be "plainly adapted" to furthering Congress's delegated authority. *Artis*, 583 U.S.

at 90.  Therefore, the CSA's prohibition on intrastate marijuana cannot be justified merely on the basis that state-regulated marijuana businesses have employees, or that they use public utilities.  Employing workers might justify imposition of federal minimum wages, but it does not give Congress license to impose any regulation it believes would serve the public good, including marijuana regulation.

Because the district court applied the wrong standard, its analysis makes no mention of the Rohrabacher-Farr Amendments nor this Court's opinion in *Ne. Patients Grp.* interpreting their significance.  The district court mentions the DOJ's "federal enforcement policy," but leaves out the *legislation* that since 2014 has mandated that policy in large part.  ADD13.  These legislative developments are central to understanding why the current regime is outside Congress's authority.  *See* Part I.C, *supra*.

The district court's reasoning also improperly draws inferences contrary to the allegations in the Complaint.  The district court assumed that Plaintiffs-Appellants' businesses serve "individuals who travel from other states to obtain marijuana in Massachusetts" on a substantial "scale," ADD13, despite there being no allegations to that effect in the Complaint and despite Massachusetts being surrounded by states that have legalized and regulated marijuana.  More importantly, Congress has shown that it is not concerned about people traveling to states to participate in their state-regulated marijuana programs.  As this Court noted in *Ne. Patients Grp.*, Congress,

42

with the Rohrabacher-Farr Amendments, has barred enforcement of the CSA against participation in state medical marijuana programs, including Maine's, which "affirmatively encourages out-of-staters to participate in the medical marijuana market as customers." 45 F.4th at 547. Given the policy choices reflected in the Rohrabacher-Farr Amendments, it cannot be said that state-regulated marijuana activities "affect adversely the congressional regulation" of marijuana, even if one assumes consumers are travelling across state lines to participate in those programs. *Wrightwood Dairy Co.*, 315 U.S. at 121.

### 2. The District Court Incorrectly Concluded That *Raich* Permits No Fact Development in Any Challenge to Congress's Regulation of Intrastate Commerce.

The district court also held that no factual development was appropriate, because it concluded that the only question for the Court under *Raich* was "whether Congress could rationally conclude the plaintiffs' conduct had a substantial affect on interstate commerce, *rather than whether the plaintiffs could prove that it did not*." ADD12 (emphasis added). This too was error.

*Raich* was not decided at the motion to dismiss stage; it came before the Court on the plaintiffs' motion for preliminary injunction, in which the plaintiffs had the burden of demonstrating "a likelihood of success on the merits of their legal claims." 545 U.S. at 8. The *Raich* Court did not have to assume the truth of any factual assertions by the plaintiffs nor draw inferences in their favor. Moreover, there was

43

no real disagreement in *Raich* over the facts: "the parties and the numerous amici all seem to agree" in *Raich* that marijuana at the time was a fungible commodity like wheat. *See id.* at 21. Today, Plaintiffs-Appellants' allegations show otherwise, and when applying *Raich* to the Complaint, the district court did not adjust for this different procedural posture and improperly refused to permit Plaintiffs-Appellants to prove that the CSA's findings today are unsupported.

To be sure, *Raich* permits courts to dispense with fact finding when the connection to Congress's interstate goals is "visible to the naked eye." *Id.* at 28–29. Here, however, Congress's legislation since *Raich* has rendered the connection between interstate goals and local regulation anything but obvious; therefore, the district court erred by precluding any fact finding.

"A statute based upon a legislative declaration of facts is subject to constitutional attack *on the ground that the facts no longer exist*; in ruling upon such a challenge *a court must, of course, be free to re-examine the factual declaration*." *Leary v. United States*, 395 U.S. 6, 38 n.68 (1969) (emphasis added). The "constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." *Whole Woman's Health*, 579 U.S. at 601 (quoting *United States v. Carolene Prod. Co.*, 304 U.S. 144, 153 (1938)).

44

To hold otherwise, as the district court did, would mean that Congress's findings are impervious to reality. To the contrary: "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Morrison*, 529 U.S. at 614. When Congress attempts to control local activities to further an interstate goal, courts have a responsibility to examine the facts "to understand the problem before Congress and determine whether the Act is a reasonable and appropriate means toward its solution." *Katzenbach*, 379 U.S. at 299; *id.* at 303.

"As we stated in *Lopez*, 'Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.'" *Morrison*, 529 U.S. at 614 (original brackets omitted) (quoting *Lopez*, 514 U.S. at 557 n.2). "Rather, whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question," and thus requires adjudication. *Id.* (original brackets omitted) (quoting *Lopez*, 514 U.S. at 557 n.2). Even under the more deferential standard applied when "challenging legislation under the Equal Protection Clause," plaintiffs "may introduce evidence supporting their claim that it is irrational." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981).

Accordingly, the district court erred by not applying the requirement that Congress's regulation of intrastate commerce must be plainly adapted to a current interstate Congressional goal. It then compounded this error by concluding that *Raich* permits no factual development, even where Plaintiffs-Appellants have alleged facts that, if true, would render Congress's conclusions without support. Either of these errors warrants reversal.[2]

## II. Plaintiffs-Appellants Plausibly Alleged a Fifth Amendment Claim Based on the Long History of Laws and Practices Recognizing Marijuana's Importance.

The Complaint alleges an independent ground for holding the CSA unconstitutional as applied to Plaintiffs-Appellants: the CSA's prohibition on state-regulated marijuana violates Plaintiffs-Appellants' rights to cultivate and transact in marijuana. The Complaint alleges, and legal authorities confirm, that this right is deeply rooted in this nation's history and its legal traditions. This right is further reinforced by current legal trends, which include the vast majority of the states—thirty-eight—permitting the cultivation and distribution of marijuana.

---

[2] None of the above arguments depends on the Supreme Court overruling *Raich*. Plaintiffs reserve the right to argue before the Supreme Court that *Raich* was wrongly decided even under the facts as they existed in 2005.

## A. Marijuana Cultivation and Usage Is Deeply Rooted in the Nation's History and Tradition.

Substantive due process protects "rights that are not mentioned in the Constitution" provided that they are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Dobbs*, 597 U.S. at 231 (quoting *Glucksberg*, 521 U.S. at 721). "If the asserted right is considered fundamental, any infringement of that right will be subject to strict scrutiny and will be deemed unconstitutional 'unless the infringement is narrowly tailored to serve a compelling state interest.'" *Richards v. Holder*, 2014 WL 2805280, at *3 (D. Mass. June 19, 2014) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).

The Supreme Court has instructed that "our Nation's history, legal traditions, and practices thus provide the crucial guideposts" for conducting this substantive due process analysis. *Glucksberg*, 521 U.S. at 721. This historical formulation of the fundamental rights test was confirmed in *Dobbs*, which explained that "in conducting this inquiry, we have engaged in a careful analysis of the history of the right at issue." 597 U.S. at 238. Thus "the relevant question is not whether the asserted interest 'is consistent with this Court's substantive-due-process line of cases,' but whether it is supported by 'this Nation's history and practice.'" *Kerry v. Din*, 576 U.S. 86, 95 (2015) (quoting *Glucksberg*, 521 U.S. at 723–24).

In conducting this analysis, particular importance is placed on practices in the "early American Colonies" and at "the time the Fourteenth Amendment was

ratified." *Glucksberg*, 521 U.S. at 710–16; *see also Timbs v. Indiana*, 586 U.S. 146, 151–54 (2019).  As set out below, the Complaint alleges facts from both time periods showing widespread recognition of the value of marijuana commerce.  *See* A30–33 (Compl. ¶¶ 46–52) (detailing the nation's history of marijuana cultivation and commerce and the states' promotion thereof, beginning with colonial legislation dating back to 1619); A115 (Oral Arg. Tr. at 44:11-17) ("Marijuana has historically, as we set out in the complaint, historically been widely used, widely tolerated.  The federal government change is relatively recent and an interruption of that.").  The district court erred by not considering this historical evidence.

### 1.  The Original Colonies Promoted Marijuana Cultivation.

Prior to the Founding, marijuana (then known simply as "hemp") was a vital crop for early American colonists and was promoted through legislation.  A30 (Compl. ¶ 46).  Each of the thirteen original colonies enacted laws concerning hemp. Some colonial hemp laws encouraged (or even *required*) colonists to grow hemp on their farms or outlawed the destruction of hemp crops.[3]  Some colonies even

---

[3] Nadra O. Hashim, *Hemp and the Global Economy*, at 41 (2017) ("[T]he Virgina and Connecticut legislatures, made the mandatory growing of hemp law in 1631 and 1632, respectively.").

permitted hemp to be used "as money for the purposes of payment of public debts."[4]

Below are examples of hemp-promoting and hemp-protecting laws in each colony.

| 1619 | Virginia | A law stating that "for hemp . . . we do require and enjoine all householders of this Colony that have any of those seeds to make trial thereof the nexte season."[5] |
|---|---|---|
| 1660 | Massachusetts | A law prohibiting the "wanton destruction" of hemp.[6] |
| 1718 | New Hampshire | A law to "encourage the sowing and curing of hemp."[7] |
| 1721 | Rhode Island | A law providing that "the general treasurer" shall pay "eight pence per pound . . . for good merchantable hemp."[8] |
| 1722 | Pennsylvania | A law "for encouraging the raising of Hemp within this Province."[9] |

---

[4]    Claire Priest, *Currency Policies and Legal Development in Colonial New England*, 110 Yale L.J. 1303, 1324 (2001).

[5] *The Records of the Virginia Company of London*, at 166 (1906), available at https://www.loc.gov/item/06035006/.

[6] *The Book of the General Lawes and Libertyes Concerning the Inhabitants of the Massachusetts,* at 289 (1660), available at https://archives.lib.state.ma.us/handle/2452/430907.

[7] *Acts and Laws of His Majesty's Province of New Hampshire in New England with Sundry Acts of Parliament*, at 122 (1761), available at https://babel.hathitrust.org/cgi/pt?id=hvd.hxj3t1&view=1up&seq=146&skin=2021&q1=hemp.

[8] *Records of the Colony of Rhode Island and Providence Plantations, in New England*, vol. IV, at 296–97 (1859), available at https://babel.hathitrust.org/cgi/pt?id=hvd.32044032309577&seq=307&q1=hemp.

[9] *The Acts of Assembly of the Province of Pennsylvania*, at 147 (1775), available at https://babel.hathitrust.org/cgi/pt?id=mdp.35112203944154&view=1up&seq=7&skin=2021.

| 1734 | Connecticut | A law "for the Encouragement of raising Hemp, making Canvas or Duck; and also for making fine Linen."[10] |
| 1736 | South Carolina | A law "for Encouraging the Raising of Hemp, Flax, and Silk, within the Province of South Carolina."[11] |
| 1763 | New York | A law resolving that "an Encouragement should be given for the raising of Hemp."[12] |
| 1764 | North Carolina | A law "encouraging the Culture of Hemp and Flax, and other Purposes."[13] |
| 1765 | Maryland | A law "for the benefit of the poor, and encouragement of industry," which empowered "each county court" to purchase "the best pieces of linen, made of flax or hemp of the growth of this province."[14] |
| 1765 | New Jersey | A law "granting a Bounty upon the raising of Flax and Hemp."[15] |

---

[10] *Acts and Laws, of His Majesties Colony of Connecticut in New England: Passed by the General Assembly May 1716 to May 1749*, at 421, 426 (1919), available at https://babel.hathitrust.org/cgi/pt?id=uc2.ark:/13960/t81j9p88z&view=1up&seq=5&skin=2021.

[11] *Acts Passed by the General Assembly of South-Carolina*, Numb. VI, at 40 (1736), available at https://babel.hathitrust.org/cgi/pt?id=mdp.35112203944386.

[12] *The Colonial Laws of New York from the Year 1664 to the Revolution*, vol. IV, ch. 1228, at 737 (1894), available at https://babel.hathitrust.org/cgi/pt?id=uc1.b4177897.

[13] *Acts of the North Carolina General Assembly*, ch. V, at 613 (1764), available at https://docsouth.unc.edu/csr/index.php/document/csr23-0044.

[14] *Laws of Maryland Made Since M,DCC,LXIII, Consisting of Acts of Assembly under the Proprietary Government*, ch. VI, at 1765 (1787), available at https://babel.hathitrust.org/cgi/pt?id=mdp.35112203945748.

[15] *Acts of the General Assembly of the Province of New-Jersey*, ch. CCCCXX, at 281 (1776), available at https://babel.hathitrust.org/cgi/pt?id=mdp.35112203945466&.

| 1768 | Georgia | A law "for encouraging the Cultivation of Hemp Flax and wheat and for Regulating the Inspection of Hemp flax and wheat Flour."[16] |

Thus, among the colonies, hemp was universally recognized as a productive crop and each colony sought to spur or protect its cultivation.

## 2. Marijuana Was Widely Used for Medical and Recreational Use Around the Passage of the Fourteenth Amendment.

Marijuana's importance continued into the next critical period for fundamental rights analysis, the years surrounding the adoption of the Fourteenth Amendment, during which time marijuana was "highly valued" for its medicinal and recreational uses. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 770 (2010) (observing, as part of fundamental rights analysis, that "the right to keep and bear arms was highly valued for purposes of self-defense" around "the 1850s"). As described in the Complaint, "by the middle of the 19th Century, Americans were using marijuana for medicinal and recreational purposes," and cannabis was "widely utilized as a patent medicine in the 1800s." A31 (Compl. ¶ 47). In 1850, the United States Pharmacopoeia listed cannabis as a medical treatment. *Id.* In 1876, Louisa May Alcott (the author of *Little Women*) wrote glowingly about edible marijuana as an "amusement" in a short story. A31 (Compl. ¶ 48).

---

[16] *The Colonial Records of the State of Georgia*, vol. XIX, part I, at 89 (1911), available at https://babel.hathitrust.org/cgi/pt?id=yale.39002015723142.

Against this backdrop, the 20th-Century movement towards banning and criminalizing marijuana, which culminated in 1970 with the CSA, is a historical aberration compared to the practices in this country in the 17th, 18th, 19th, and now 21st centuries.  Supreme Court caselaw makes clear that such temporary lapses in the recognition of a right do not undermine the right's importance.  *See, e.g., Lawrence v. Texas*, 539 U.S. 558, 568–71 (noting that for much of history, same-sex relations were not specifically criminalized, and "[i]t was not until the 1970's that any State singled out same-sex relations for criminal prosecution").

### 3. At English Common Law, Marijuana Was Categorized as a Productive Crop, and Its Cultivation Was Protected by Laws Dating Back to the Magna Carta.

The American tradition of protecting and promoting marijuana commerce dates back even further to English common law and statutes.  Pre-founding common law authorities and the Magna Carta are important sources in identifying fundamental rights.  *See Kahler v. Kansas*, 589 U.S. 271, 279 (2020) (in assessing whether an activity is rooted in our nation's history, "we look primarily to eminent common-law authorities (Blackstone, Coke, Hale, and the like), as well as to early English and American judicial decisions"); *Kerry*, 576 U.S. at 91–92 (analyzing the protections afforded by the due process clause by looking to "its origin in Magna Carta," the writings of Edward Coke, and Blackstone's Commentaries).

Here, English sources confirm that "for over 700 years, the Anglo-American common-law tradition" has contained protections for marijuana commerce. *See Glucksberg*, 521 U.S. at 710–16. Edward Coke categorized hemp as one of several "blada," a term referring to crops that required human labor to grow, and which was associated with specific rights in English law. Edward Coke, *The Second Part of the Institutes of the Laws of England*, Merton, ch. II, at 81 (1797). This "blada"—or "bladum" in the singular—is defined by Coke: "Blada signifieth corne or graine while it groweth: It properly signifeith corne or graine while it is in herba, dum feges in herba: but it is taken for all manner of corne or graine, or things annuall coming by the industry of man, as *hemp*, flax, & c." *Id.* (emphasis added).

The right to cultivate and possess "blada" was formalized in both the Magna Carta and the Merton Statutes. The Magna Carta states that "no constable, nor his bailiff" shall seize "blada" without payment for the same. *Id*., Magna Carta, ch. XIX, at 33. Thus the very document that serves as the foundation for the Due Process clause contained protections for cultivating crops that English common law defined as including hemp. *Obergefell v. Hodges*, 576 U.S. 644, 723 (2015) (Thomas & Scalia, JJ., dissenting) ("Both of the Constitution's Due Process Clauses reach back to Magna Carta.").

Decades later, the Merton Statutes created additional rights concerning hemp cultivation. The Merton Statutes provide: "Also from henceforth widows may

53

bequeath the crop of their ground, as well of their dowers, as of other their lands and tenements, saving to the lords of the fee, all such services as be due for their dowers and other tenements."  Coke, *The Second Part of the Institutes of the Lawes of England*, Merton, ch. II, at 80 (1797).  Coke includes the original Latin, which in place of "crop of their ground," uses the term "blada," which in turn includes "hemp."  *Id.*

Nor was Coke the only authority that interpreted the term "blada"—and all its attendant rights—as referring to hemp.  Consistent with Coke's writings, the Dictionary of English Law defines "bladum" as "fruit, corn, *hemp*, flax, herbs."  *See* Giles Jacob, *Dictionary of English Law*, at 92, "Blada (Bladum)" (8th ed. 1762) (emphasis    added),    available    at    https://babel.hathitrust.org/cgi/pt?id= osu.32437121669028&seq=7.  Black's Law Dictionary similarly refers to "blada" as "the yield of a piece of land" and states that the modern concept of "Emblements" derives from this term.  Emblements, *Black's Law Dictionary* (12th ed. 2024).

Unsurprisingly, then, Blackstone placed "hemp" in the legal category of "emblements": "Emblements are corn, peas, beans, tares, *hemp*, flax, and annual roots, as parsnips, carrots, and turnips."  William Blackstone, *Commentaries on the Laws of England in Four Books, vol. 1*, ch. VIII, § 2, at 375 n.2 (1753) (emphasis added).  Hemp, according to Blackstone, thus carries with it all the rights associated with emblements, including that "if a tenant for his own life sows the lands, and dies

54

before harvest, his executors shall have the emblements, or profits of the crop." *Id.* ch. VIII, § 2, at 375.

In other instances, English law provided specifically for hemp standing alone, rather than as a member of the category of blada or emblements. Because of the great value of hemp as a crop, at various times throughout the 16th–18th centuries, governmental authorities made the cultivation of hemp compulsory. For example, in 1533, King Henry VIII "issued a writ that made growing hemp mandatory" because "[h]emp production was essential to naval canvas sails, rope, and rigging." Nadra O. Hashim, *Hemp and the Global Economy*, 22–23 (2017).

Thus, English legal authorities show a long legal tradition of recognizing the importance of marijuana commerce, one which continued in pre-Founding colonial laws and in the treatment of marijuana around the time of the adoption of the Fourteenth Amendment.

## B. The Widespread Adoption of State-Regulated Marijuana Programs Further Demonstrates the Importance of Marijuana Commerce.

Those centuries of Anglo-American legal traditions concerning marijuana are now being continued in thirty-eight states, including Massachusetts. In *Lawrence*, the Court relied on "an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex," when striking down Texas's anti-sodomy law. 539 U.S. at 570–72 (noting that "only nine States" "singled out same-sex relations for criminal prosecution").

55

Here, the Complaint shows that recognition of the right to engage in Plaintiffs-Appellants' activities is similarly widespread. Thirty-eight states and multiple federal territories have established marijuana programs. *See* A34 (Compl. ¶ 55); *Cook v. Gates*, 528 F.3d 42, 54 (1st Cir. 2008) ("*Lawrence* recognized that, in at least some circumstances, the consideration of recent trends and practices is relevant to defining the scope of protected liberty."). By comparison, when *Obergefell* was decided, only seventeen states had "granted marriage rights to same-sex couples, either through judicial or legislative processes." 576 U.S. at 662, 685 (App'x B). Ten years ago, the Ninth Circuit observed that "the passage of time coupled with changing social views may alter the fundamental rights analysis" as to marijuana. *See Sacramento Nonprofit Collective v. Holder*, 552 F. App'x 680, 683 (9th Cir. 2014). That time has now come.

The district court held that these modern trends are irrelevant under *Dobbs*, ADD14, but *Dobbs* instructs courts to ignore modern practices when they are inconsistent with historical analysis. 597 U.S. at 235–40. With marijuana, no such conflict exists: both Anglo-American traditions and modern trends recognized the right to cultivate and possess the cannabis plant. A16, 30–34 (Compl. ¶¶ 8, 46–52, 55). Plaintiffs-Appellants have therefore plausibly alleged a Fifth Amendment claim, alongside their claim that the CSA exceeds Congress's authority under the Commerce Clause and Necessary and Proper Clause.

56

## **CONCLUSION**

The order of the district court dismissing the Complaint should be reversed.

Dated: September 10, 2024                    Respectfully submitted,

*/s/ David Boies*
David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200
dboies@bsfllp.com

Jonathan D. Schiller
Matthew L. Schwartz
David P.G. Barillari
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300
jschiller@bsfllp.com
mlschwartz@bsfllp.com
dbarillari@bsfllp.com

Joshua I. Schiller
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street
41st Floor
San Francisco, CA 94104
(415) 293-6899
jischiller@bsfllp.com

*Attorneys for Plaintiffs-Appellants Canna Provisions, Inc., Gyasi Sellers, Wiseacre Farm, Inc., and Verano Holdings Corp.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Undersigned counsel certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,959 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

Undersigned counsel certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of the Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word 2010.


Dated:  September 10, 2024

*/s/ David Boies*
David Boies

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on September 10, 2024.

I certify that all participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: September 10, 2024

*/s/ David Boies*

David Boies

ADDENDUM

## ADDENDUM TABLE OF CONTENTS

**Page**

Memorandum and Order Regarding Defendant's Motion to Dismiss,
filed July 1, 2024 .................................................................... ADD1

Order of Dismissal, filed July 2, 2024 ..........................................ADD16

i

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CANNA PROVISIONS, INC.; GYASI SELLERS; WISEACRE FARM, INC.; VERANO HOLDINGS CORP.<br><br>Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, in his official Capacity as Attorney General of the United States<br><br>Defendant. | Civil Action No. 23-30113-MGM |

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION TO DISMISS
(Dkt. No. 29)

July 1, 2024

MASTROIANNI, U.S.D.J.

I.    INTRODUCTION

Almost twenty years ago, the Supreme Court declined to find that the reach of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, exceeded the bounds of federal authority when applied to noncommercial, wholly-intrastate activities involving small-scale cultivation and possession of marijuana for personal medical use. *Gonzalez v. Raich,* 545 U.S. 1 (2005). The plaintiffs had argued that Congress lacked authority under the Commerce Clause to criminalize the cultivation and possession of marijuana that never enters the stream of commerce and is consumed in compliance with state law and pursuant to a physician's prescription. Despite acknowledging "the troubling facts" of the case, the Court wrote that "[o]ur case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17.

ADD1

Now, Plaintiffs, four owners of marijuana businesses that operate in Massachusetts and in compliance with state law, have asked this court to reach a different conclusion about the limits the Commerce Clause imposes on Congressional authority.[1] Plaintiffs support their position by detailing the extent of changed views about marijuana, state regulation, and federal enforcement since the Supreme Court decided *Raich*. While the Complaint has alleged persuasive reasons for a reexamination of the way the Controlled Substances Act ("CSA") regulates marijuana, the relief sought is inconsistent with binding Supreme Court precedent and, therefore, beyond the authority of this court to grant. Plaintiffs do not provide a basis for this court to disregard the broad reading of the Commerce Clause first announced in *Wickard v. Filburn*, 317 U.S. 111 (1942), and reaffirmed in *Raich. See State Oil v. Kahn*, 522 U.S. 3, 20 (1997) (explaining that it is the "[Supreme] Court's prerogative alone to overrule one of its precedents"); *see also United States v. Diggins*, 36 F.4th 302, 311 (1st Cir. 2022) ("We are in no position to overrule binding Supreme Court precedent."). Plaintiffs also argue that application of the CSA to their activities violates their rights to substantive due process; a claim raised in *Raich*, but not addressed by the Supreme Court. For the reasons that follow, this court discerns no plausible violation of substantive due process. Plaintiffs have not identified a basis for finding a fundamental right to engage in the cultivation and distribution of marijuana or that the CSA cannot survive rational basis review.

Finally, and as the Supreme Court noted in *Raich*, the absence of judicial relief from this court does not leave Plaintiffs without "another avenue of relief." *Raich*, 545 at 33. Plaintiffs can pursue their claims and seek the attention of the Supreme Court. They also are free to advocate for marijuana to be reclassified or removed from the CSA.

---

[1] Massachusetts permits marijuana to be sold to and consumed by adults for both medical and recreational purposes and Plaintiffs serve both types of consumers. Although there may be reasons to separately assess the basis for regulating these distinct types of consumption, neither Plaintiffs' Complaint, nor this decision, addresses those distinctions.

ADD2

II.     BACKGROUND

A. The CSA and Federal Enforcement

In 1970, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act, which contained the CSA at Title II of the Act. *Raich*, 545 U.S. at 10, 12. At the time, marijuana was banned in all 50 states, subject to some limited exceptions. *Leary v. U.S.*, 395 U.S. 6, 16-17 (1969). In the preceding year, President Nixon had "declared a national 'war on drugs'" and the Supreme Court had "held certain provisions of the Marihuana Tax Act and other narcotics legislation unconstitutional." *Raich*, 545 U.S. at 10, 12. In *Raich*, the Supreme Court reported that "[t]he main objectives of the CSA were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." *Id.* at 12. Congress attempted to effectuate these goals by creating "a closed regulatory system" under which it was "unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." *Id.* at 13. All substances were "grouped together based on their accepted medical uses, the potential for abuse, and their psychological and physical effects on the body." *Id.* "Congress classified marijuana as a Schedule I drug," grouping it with other substances considered to have a "high potential for abuse, lack of any accepted medical use, and absence of any accepted safety for use in medically supervised treatment." *Id.* at 14. The CSA makes it a federal criminal offense to manufacture, distribute, dispense, or possess Schedule I drugs, including marijuana, except within a preapproved research study. *Id.* In addition, the CSA imposes controls on the handling of the substances in all five classifications and separate federal approval is required before a drug can be marketed for medical use. *Id.* at 27-28; *see also* 21 U.S.C. §§ 321, 352.

Plaintiffs assert that marijuana has been miscategorized and, at the motion to dismiss stage, the court accepts as true their assertions about the safety of marijuana and its therapeutic benefits. The CSA provides a process for moving substances from one schedule to another and the Department

ADD3

of Justice has commenced a process that could result in marijuana being moved from Schedule I to Schedule III. However, at this time, marijuana continues to be listed on Schedule I and, therefore, almost all activities that involve growing, processing, and possessing marijuana continue to be federal crimes. This is true even though thirty-eight states have adopted programs that legalize marijuana within a strict, state regulatory framework. Some states only permit marijuana used for medical purposes, while other states also allow marijuana to be consumed on a non-medical or adult-use basis.

Massachusetts is one of the states that operates a highly regulated system permitting both medical and adult-use marijuana businesses. In order to participate in the legal marijuana marketplace, all businesses must comply with exacting local and state regulatory requirements designed to ensure that all products containing marijuana are closely traced and that businesses operate in a manner that is safe for their customers, employees, and the local community. Rigorous regulation seeks to ensure that all the marijuana that moves through the legal Massachusetts market is grown, processed, and sold within the state. The regulatory scheme also includes taxes and community impact fees that generates significant revenue for state and local governments.

Plaintiffs have alleged there is data demonstrating that as state-regulated marijuana markets have grown, the amount of marijuana that travels in interstate and international commerce has declined dramatically. They assert that the federal government has responded to state-level legalization of marijuana by abandoning the "closed regulatory system" created by the CSA. Since 2014, Congress has included language in annual appropriations acts that prohibits the Department of Justice from using funds to challenge state laws legalizing medical marijuana, and Congress has not interfered with marijuana legalization programs adopted by the District of Columbia and several territories. For much of the last decade, the Department of Justice has acted in accordance with either a formal or informal policy not to prosecute individuals or companies under the CSA for conduct that complied with state laws that permit intrastate possession, cultivation, and distribution of marijuana.

ADD4

B. Plaintiffs

The claims in this case are asserted on behalf of four businesses openly operating in Massachusetts in full compliance with state laws and regulations. Despite the legality of their operations under state law, Plaintiffs have alleged that the federal criminalization of activities involving marijuana has negatively impacted their financial viability. Plaintiffs have alleged specific injuries suffered by each business and attributed to the criminalization of marijuana under the CSA, though they have not quantified the monetary value of those injuries.

Canna Provisions, Inc. ("Canna") is a Massachusetts corporation that operates a cultivation facility and two retail, adult-use marijuana dispensaries within Massachusetts. The Complaint alleges there are many businesses who will not work with Canna because of federal marijuana policy. Canna's marketing efforts have been limited because promotional companies and magazines have refused to work with it. Many business service providers, like banks, payroll services, 401(k) providers, and insurance companies also refuse to work with state-regulated marijuana businesses and, as a result, Canna has had to pay "higher interest rates, insurance premiums, and payments for goods and services." (Compl. at ¶ 36.) Although Canna was able to accept credit cards for a period of time, credit card processors are no longer willing to work with marijuana businesses, even those operating under state law. When Canna lost the ability to accept credit cards, the average amount spent by customers at Canna's retail stores "dropped by around 30%." (*Id.*) Canna has also been unable to sponsor job training programs through a career services organization operated by Massachusetts because marijuana is illegal under federal law. Finally, Canna has alleged that its employees and officers have had trouble obtaining mortgages and accessing personal banking services because they earn their income in the cannabis industry.

Gyasi Sellers ("Sellers") is an entrepreneur who operates a state-licensed courier service for adult-use marijuana. He is also in the process of obtaining a license to operate a marijuana retail

ADD5

delivery service. Like Canna, the business operated by Sellers is not able to accept credit cards because credit card processors will not work with marijuana businesses. The inability to accept credit cards has created economic and security risks for his business. Sellers's customers cannot prepay for their orders and the drivers he employs must interact directly with customers to collect payments. Federal rules regarding marijuana also prevent him from making deliveries to the homes of clients who live in federally-funded housing. Finally, Sellers has been unable to access financial assistance for his business from the Small Business Administration because marijuana businesses, even those which comply with state law, are ineligible for SBA assistance.

Wiseacre Farm, Inc. ("Wiseacre") is a Massachusetts corporation licensed by Massachusetts to cultivate marijuana on its outdoor farm. Payroll processors, insurers, and banks have all refused to work with Wiseacre because its income is derived from the cultivation of marijuana, which is illegal under federal law. This has increased the operational costs and risks for Wiseacre, which must pay its employees by checks and work with banks who charge Wiseacre additional fees because it is a marijuana business. Wiseacre has also lost an opportunity to grow its operation because it was unable to lease land from another farm because Wiseacre's marijuana cultivation on a portion of the farm's land would have disqualified the entire farm from receiving any federal assistance.

Finally, Verano Holdings Corp. ("Verano") is a Canadian corporation with subsidiaries in several states. In Massachusetts, Verano's wholly-owned subsidiaries operate cultivation and manufacturing facilities and medical and adult-use dispensaries. Like Canna and Sellers, Verano is not able to accept credit cards. Verano is only able to work with a limited group of business service providers because its business is illegal under federal law. Although Verano has been able to obtain insurance, it pays higher insurance premiums than it would if its business were legal under federal law.

6

ADD6

III.     ANALYSIS

A. Standing

This court's "judicial power is limited by Article III of the Constitution to actual cases and controversies" involving plaintiffs who have standing to sue. *Kerin v. Titeflex Corp.*, 770 F.3d 978, 981 (1st Cir. 2014). "Standing is 'built on a single basic idea—the idea of separation of powers.'" *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. __, 144 S. Ct. 1540, 1545 (2024). "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *Id.* at 1554-55 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 (1982)). "'Our system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed." *Id.* at 1555 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)). The standing requirement is one of several tools that play an important, though not exclusive, role in preventing courts from inadvertently usurping those political processes. *Id.*

Since this court must be assured of its jurisdiction before reaching the merits of Plaintiffs' claims, the court turns first to Defendant's arguments that Plaintiffs lack standing. *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 46 (1st Cir. 2020). Although the government is the moving party, Plaintiffs, "as the party invoking federal jurisdiction," bear the burden of establishing that they have standing to bring their claims in this court. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "There are two types of challenges to a court's subject matter jurisdiction: facial challenges and factual challenges." *Torres-Negrón v. J & N Records, LLC*, 504 F.3d 151, 162 (1st Cir. 2007). As the government has raised only a facial challenge to standing, the court accepts as true the factual allegations in the Complaint and draws all reasonable inferences favorable to Plaintiffs. *Katz v.*

7

ADD7

*Pershing, LLC*, 672 F.3d 64, 70 (1st Cir. 2012). Thus, to meet their burden, Plaintiffs "must sufficiently plead three elements: injury in fact, traceability, and redressability." *Kerin*, 770 F.3d at 981. Defendant challenges the sufficiency of Plaintiffs' allegations to establish an injury in fact and that any such injury is traceable to the CSA.

1.  Injury in Fact

Plaintiffs have alleged two types of injuries: economic harms and threat of prosecution. Defendant concedes that the economic harms alleged by Plaintiffs constitute an injury in fact, though it disputes that any such injuries are traceable to portions of the CSA challenged by Plaintiffs. On the other hand, Defendant contends that Plaintiffs' factual allegations about the significant changes to cultural and governmental views and policies regarding marijuana are inconsistent with their assertion of facing a threat of prosecution sufficient to constitute an injury in fact.

"For an injury in fact to be plausibly pled, it 'must be both concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35, 39 (1st Cir. 2023) (quoting *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016)). An injury is concrete if it "actually exists" and particular if it was caused by the defendant and the plaintiff was injured. *Id.* (internal quotations omitted). "In certain circumstances, 'the threatened enforcement of a law' may suffice as an 'imminent' Article III injury in fact." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017). A pre-enforcement threat of future injury is sufficient to establish an injury in fact when a plaintiff "alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

ADD8

In their Complaint, Plaintiffs allege that they are engaging in the intrastate cultivation, manufacture, possession, and distribution of marijuana. Since that conduct is clearly illegal under the CSA, even when permitted under Massachusetts law, federal prosecutors have a legal basis for prosecuting them. The question this court must answer is whether that threat of prosecution is credible or too remote and speculative. *Reddy*, 845 F.3d at 500. Citing *Reddy*, Defendant contends Plaintiffs' own allegations about the significant changes in federal policy erode the theoretical threat of enforcement down to the level of mere conjecture. *Reddy*, 845 F.3d at 500 (ruling a threat of prosecution was not sufficiently imminent to satisfy the Article III injury-in-fact requirement where preconditions to enforcement had not yet occurred).

Notwithstanding the informal policy described by Plaintiffs, Defendant "has not disclaimed any intention ever to enforce [the CSA]" against persons like Plaintiffs. *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 17 (1st Cir. 1996). Unlike the plaintiffs in *Reddy*, who faced no risk of criminal prosecution for their intended conduct and could not even face civil enforcement until after a specific buffer zone was defined and marked, Plaintiffs have already engaged in conduct proscribed by the CSA, a statute containing many provisions that continue to be actively enforced. A voluntary exercise of prosecutorial discretion applied to one type of violation does not neutralize the otherwise credible threat of prosecution that exists whenever a valid statute has been violated. *Gardner*, 99 F.3d at 15 (explaining that a threat of enforcement can be sufficient to establish standing "even though the official charged with enforcement responsibilities has not taken any enforcement action against the plaintiff and does not presently intend to take any such action").

2.  Traceability

The court next considers whether Plaintiffs' Complaint sufficiently alleges that either the threat of prosecution or the economic injuries they identify are traceable to the challenged portions of the

9

ADD9

CSA. *See Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). An injury is "fairly traceable" if there is "'a causal connection between the injury and the conduct complained of.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). There is a direct, causal connection between the threat of prosecution Plaintiffs face and the challenged portions of the CSA. Plaintiffs have alleged they variously engage in the cultivation, manufacture, distribution, and possession of marijuana, wholly within Massachusetts and the CSA makes such activity a federal crime. In the absence of any dispute regarding redressability, the court finds Plaintiffs have demonstrated that they have standing under Article III to challenge the portions of the CSA applicable to intrastate activities related to marijuana. *See FDA*, 144 S. Ct. at 1556 ("Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish.").

The court also finds Plaintiffs have shown there is a causal connection between their economic injuries and the CSA. "The requirement that an alleged injury be fairly traceable to the defendant's action does not mean that the defendant's action must be the final link in the chain of events leading up to the alleged harm." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 45 (1st Cir. 2005). On the other hand, "the 'line of causation . . . must not be too speculative or too attenuated." *FDA*, 144 S. Ct. at 1557. Courts must use care in determining whether the causal chain is strong enough to sustain standing despite independent actions by third parties. *Dantzler*, 958 F.3d at 47-48. "[T]he fact that the deleterious effect of a statute is indirect will not by itself defeat standing." *Wine & Spirits Retailers, Inc.*, 418 F.3d at 45. However, "the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." *FDA*, 144 S. Ct. at 1557.

When credited, Plaintiffs' detailed allegations about their financial injuries meet that burden. Though individual decisions by specific third parties are the final link in the causal chain, the economic injury actually flows from the multitude of similar decisions made by many third parties, all responding

10

ADD10

to the CSA. In the aggregate, the decisions have caused a predictable "downstream injury to plaintiffs" by dramatically reducing their options for obtaining business services compared to the options available to non-marijuana businesses. *Id.* Though the third-party decisions are not directly compelled by the CSA, they are all foreseeable responses to the risks and uncertainties the CSA imposes on transactions with state-regulated marijuana businesses and, together, they inflict a common injury on Plaintiffs. *See id.* at 1557-58. For these reasons, the court finds the Plaintiffs' economic injuries provide an additional basis for standing.

   B.   Failure to State a Claim

   The court turns to the government's arguments that this Complaint should be dismissed "for failure to state claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); Fed. R. Civ. P. 12(b)(6). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The court accepts all well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor, but "do[es] not credit legal labels or conclusory statements." *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022). Dismissal is appropriate if the complaint fails to establish at least one "material element necessary to sustain recovery under some actionable legal theory." *N.R. by and through S.R. v. Raytheon Co.,* 24 F.4th 740, 746 (1st Cir. 2022) (internal quotations omitted). A legal theory is actionable to the extent it does not conflict with binding precedent. *See Lyman v. Baker*, 954 F.3d 351, 370 (1st Cir. 2020) (affirming dismissal of claim foreclosed by controlling case). Defendant argues Plaintiffs' Complaint provides an insufficient basis for this court to find the CSA, as applied to Plaintiffs, either exceeds the authority

11

ADD11

Congress has under the Commerce Clause and Necessary and Proper Clause or violates Plaintiffs'

rights to due process under the Fifth Amendment. The court addresses each argument in turn.

1. Commerce Clause

"In our federal system, the National Government possesses only limited powers," which do

not include the power to criminalize an "act committed wholly within a State" unless the act has "some

relation to the execution of a power of Congress, or to some matter within the jurisdiction of the

United States." *Bond v. United States*, 572 U.S. 844, 854 (2014) (internal quotation omitted). Article I,

§ 8, of the Constitution vests Congress with authority "'[t]o make all Laws which shall be necessary

and proper for carrying into Execution' its authority to 'regulate Commerce with foreign Nations, and

among the several states.'" *Raich*, 545 U.S. at 5 (quoting Art. 1, § 8). In *Raich*, the Supreme Court

reaffirmed the already well-established view that the authority Congress enjoys under the Commerce

Clause permits the regulation of local, non-commercial activity, if there is a rational basis from which

Congress could have concluded that such activity would substantially affect interstate commerce. *Id.*

at 22. More specifically, the Supreme Court held that "[t]he CSA is a valid exercise of federal power,

even as applied to" the *Raich* plaintiffs because Congress had a rational basis for concluding that even

their limited, non-commercial cultivation and use of marijuana, if "taken in the aggregate" could

"substantially affect interstate commerce." *Id.* Notably, the Supreme Court deferred to the legislative

process by inquiring only whether Congress could rationally conclude the plaintiffs' conduct had a

substantial affect on interstate commerce, rather than whether the plaintiffs could prove that it did

not. *Id.*

This court must apply the same analytic framework in this case because Plaintiffs' Commerce

Clause claim is legally identical to the claim in *Raich*. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,

490 U.S. 477, 484 (1989) (explaining that only the Supreme Court can overrule its own decisions and

12

ADD12

lower courts must apply a precedent with direct application, even if there is a basis for believing the precedent has been undermined by later developments). As in *Raich*, the question this court must answer is not whether, as a factual matter, Plaintiffs' activities substantially affect interstate commerce, but simply whether Congress had a rational basis to so conclude. *Raich*, 545 U.S. at 22. Since Congress is not required "to legislate with scientific exactitude," conflicts between actual data about how state-sanctioned intrastate marijuana markets interact with the illicit interstate marijuana market and congressional findings, or an absence of relevant findings, do not establish that Congress lacked a rational basis for using the CSA to criminalize the type of conduct alleged by Plaintiffs. *Id.* at 17.

Logically, if, as the Supreme Court found in *Raich*, an aggregation of limited, non-commercial marijuana activity provided that rational basis, this court must find the same to be true of Plaintiffs' larger-scale, commercial activities. *See Ne. Patients Grp. v. United Cannabis Patients and Caregivers of Me.*, 45 F. 4th 542, 547 (1st Cir. 2022) (noting that an intrastate medical marijuana market that welcomes customers from other states is part of a larger, interstate medical marijuana market). As Plaintiffs' own allegations demonstrate, they operate on a scale that far exceeds the activities at issue in *Raich* and *Wickard*. Their businesses, together with other Massachusetts marijuana businesses, necessarily impact interstate commerce in ways that would only increase were they to obtain the relief they seek. They consume utilities and supplies; utilize the internet and a variety of business services; recruit and train employees; and serve consumers, including individuals who travel from other states to obtain marijuana in Massachusetts.

Given the scale of Plaintiffs' operations, the court cannot find Congress lacks a rational basis for concluding Plaintiffs' activities substantially affect interstate commerce without ignoring the Supreme Court's broadly-worded holding in *Raich*. To reach a different outcome would require this court to independently determine that the underlying analysis in *Raich* cannot survive the developments in intrastate regulatory schemes and federal enforcement policy alleged by Plaintiffs.

13

ADD13

Since only the Supreme Court can overrule *Raich*, this court concludes that Congress has authority under the Commerce Clause to regulate Plaintiffs' wholly-intrastate, state-sanctioned marijuana activities and dismisses their as-applied challenge to the CSA. Plaintiffs' argument, that the factual differences between their allegations and those considered in *Raich* simply permit this court to avoid application of *Raich* and substitute its own Commerce Clause analysis, has no realistic persuasive force.

2.  Substantive Due Process

Plaintiffs' substantive due process challenge to the CSA is also dismissed for failure to state a claim. There is simply no precedent for concluding that Plaintiffs enjoy a fundamental right to cultivate, process, and distribute marijuana. No such right is enumerated in the Constitution and, on remand following *Raich*, a sympathetic Ninth Circuit concluded there was no unenumerated right to use marijuana for medical purposes and the issue "remain[ed] in 'the arena of public debate and legislative action.'" *Raich v. Gonzales* ("*Raich Remand*"), 500 F.3d 850, 866 (9th Cir. 2007) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (2007)). The Ninth Circuit acknowledged that positive views about the medical uses for marijuana had been growing, but explained "that legal recognition has not yet reached the point where a conclusion can be drawn that the right to use medical marijuana is 'fundamental' and 'implicit in the concept of ordered liberty.'" *Id.* Although many more states have since legalized marijuana, for both medical purposes and adult use, there is still no national consensus on this issue. Even if there were universally applicable laws permitting the cultivation, processing, and distribution of marijuana, legalization alone neither requires nor permits this court to recognize a fundamental right to engage in such conduct. *See e.g. Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 256-57 (2022) (ruling there is no fundamental right to obtain an abortion, despite fifty years of federal caselaw legalizing abortion and recognizing such a fundamental right). In the absence of a fundamental right to engage in the cultivation, processing, and distribution of marijuana, Plaintiffs

14

ADD14

cannot prevail on their substantive due process claim. *See Hernández-Gotay v. United States,* 985 F.3d 71, 81 (1st Cir. 2021) (rejecting procedural and substantive due process challenges to a federal statute outlawing cock fighting where the statute did not infringe any cognizable liberty interest and had survived a Commerce Clause challenge).

## IV.    CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss (Dkt. No. 29) is ALLOWED and this case may now be closed.

It is So Ordered.

  /s/ Mark G. Mastroianni

MARK G. MASTROIANNI
United States District Judge

15

ADD15

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Canna Provisions, Inc. et al.,                    )
                                                  )
                                                  )
                    Plaintiff,                    )        Civil Action No.23-cv-30113-MGM
                                                  )
                                                  )
                    v.                            )
                                                  )
                                                  )
U.S. Attorney Genera Merrick Garland              )
                                                  )
                    Defendant,                    )


ORDER OF DISMISSAL
July 2, 2024

In accord with the court's Memorandum and Order [DO#47] the

Court ALLOWS Defendants' Motion to Dismiss, (Dkt. No. 29) is

GRANTED for Failure to State a Claim.


    IT IS SO ORDERED.

                                        By the Court,


                                         /s/ *Mark G. Mastroianni*
                                        Mark G. Mastroianni
                                        U.S. District Judge


ADD16